# EXHIBIT   2

Name:    JOSE GUZMAN

Address:    P. O. BOX 689   FW-205U

SOLEDAD, CA

93960-0689

CDC or ID Number:    E53800

ORIGINAL

RECEIVED
NOV 2 - 2006
CLERK SUPREME COUR

CALIFORNIA SUPREME COURT   **FILED**

SUPREME COURT

NOV 0 2 2006

(Court)   Frederick K. Ohlrich Clerk

DEPUTY

**PETITION FOR WRIT OF HABEAS CORPUS**

JOSE GUZMAN,
Petitioner

vs.

CA BOARD OF PRISON TERMS,
Respondent

No   **S147764**

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**
- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined**

- Read the entire *before* answering any questions.
- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.
- Answer all applicable questions in the proper spaces. If you need additional spaces, add an extra page and indicate that your answer is "continued on additional page."
- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.
- If you are filing this petition in the Court of Appeal, file the original and four copies.
- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.
- Notify the Clerk of the Court in writing if you change your address after filing your petition.
- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Counsel of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and court of appeal.

Form Approved by the
Judicial Counsel of California
MC-275 [Rev January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page one of six
Penal Code § 1473 et seq.
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

- [ ] A conviction
- [ ] A sentence
- [ ] Jail or prison conditions
- [ ] Other (specify): _____

- [X] Parole
- [ ] Credits
- [ ] Prison discipline

1. Your name:    JOSE GUZMAN

2. Where are you incarcerated?   CORRECTIONAL TRAINING FACILITY-SOLEDAD

3. Why are you in custody?   [X] Criminal Conviction   [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   MURDER IN THE SECOND DEGREE WITH A WEAPON AND ASSAULT WITH A DEADLY WEAPON

b. Penal or other code sections:   187 PC w/ 12022.5(a) and 245(a)(1)

c. Name and location of sentencing or committing court:   LOS ANGELES SUPERIOR COURT

d. Case number:   A980858

e. Date convicted or committed:   APRIL 26, 1990

f. Date sentenced:

g. Length of sentence:   17 YEARS TO LIFE

h. When do you expect to be released?   UNKNOWN

i. Were you represented by counsel in the trial court?   [X] Yes.   [ ] No.   If yes, state the attorney's name and address:

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury   [X] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6.  GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PENAL CODE § 3041 CREATES A LIBERTY INTEREST AND A PRESUMPTIVE RIGHT TO A PAROLE RELEASE DATE; THERE WAS NO EVIDENCE THAT PETITIONER'S COMMITMENT OFFENSE IS PARTICULARLY EGREGIOUS AND THAT PETITIONER IS UNSUITABLE FOR PAROLE; THE BPT'S DECISION WAS ARBITRARY AND CAPRICIOUS; THE HEARING WAS ADJUDICATED PRO-FORMA; THE BPT VIOLATED THE INTENT OF THE LEGISLATURE AND PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS.

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED

b.  Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED

7. Ground 2 or Ground _____ *(if applicable)*:

_____

_____

_____

_____

  a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

  b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

N/A
_____

b. Result: _____ N/A _____    c. Date of decision: _____

d. Case number or citation of opinion, if known: _____ N/A _____

e. Issues raised:    (1) _____ N/A _____

(2) _____ N/A _____

(3) _____ N/A _____

f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.   If yes, state the attorney's name and address, if known:

N/A
_____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.    If yes, give the following information:

a. Result: _____ N/A _____    b. Date of decision: _____

c. Case number or citation of opinion, if known: _____ N/A _____

d. Issues raised:    (1) _____ N/A _____

(2) _____ N/A _____

(3) _____ N/A _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

N/A
_____

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 5-31-04

(SIGNATURE OF PETITIONER)

a.  Supporting Facts:

Petitioner had previously appeared before the BPT for his second suitability hearing on September 25, 2002. He was denied parole for one year. Petitioner appealed that decision and on April 22, 2003, the Superior Court of Los Angeles County denied relief stating that Petitioner could refile his petition directly with the Court if dissatisfied with his next Board hearing.

On November 4, 2003, Petitioner appeared before the BPT for his third subsequent suitability hearing. The Board again denied parole using similar language to the one used in the September 25 hearing. Petitioner provides a copy of the decision of that hearing as well as the complete transcript of his latest hearing.

Since his last hearing, Petitioner received a more favorable Psych Report and an outstanding Counselor's Report. However, the Board at this hearing denied parole for the same reasons previously stated and ignore the findings and recommendations of the previous panel. Petitioner can only conclude that once again the hearing was adjudicated pro-forma.

In this petition, Petitioner makes essentially the same claim he made previously and respectfully requests that the Court take judicial notice and compare the transcript of the decisions rendered by the BPT in this case and acknowledge the contradictions. Petitioner also submits his latest Psych Report and Counselor's Report for review.

A brief highlight of the discrepancies noted by Petitioner follows:

DECISION
2002 HEARING

This panel reviewed all
information received from the
public and relied on the
following circumstances in
concluding that you are not
suitable for parole. And that
you would pose an unreasonable
risk of danger to society if
released from prison at this
time. Many factors were
considered. First and
foremost was the commitment
offense and its nature. The
offense -- the offenses, I
should say, were carried out
in a cruel manner, with a
callous disregard for human
suffering. (BT-39:10-20)

The Inmate Does Have An
Unstable Social History And
Prior Criminality. The social
history includes the use and
abuse of alcohol. The
relationship I tried my best
to describe that I mentioned
earlier, and also, the fact
that initially he was an
illegal immigrant, entering
into this country illegally
from Mexico. (BT-41:1-6

DECISION
2003 HEARING

This Panel's reviewed all
information received from the
public and relied on the
following circumstances in
concluding that the prisoner
is not suitable for parole and
would pose an unreasonable
risk of danger to society or a
threat to public safety if
released from prison at this
time. Mr. Guzman, the
paramount reasoning would be
the timing and the gravity of
the committing offense. The
offense was carried out in a
vicious and brutal manner.
(BT-44:8-17)

Previous record, you had a
history of -- an unstable
history of tumultuous
relationships with others
commencing at an early age,
around 13 or so, developing a
problem with substance abuse
of alcohol, as well as prior
criminal history of entering
the United sates illegally and
being deported back in 1970.
(BT-46:2-8)

| DECISION 2002 HEARING | DECISION 2003 HEARING |
|---|---|
| As far as the inmates's institutional behavior, although he has never completed a vocation or obtained a GED, <u>he has progressed well</u>. (BT-41:8-11) | <u>Institutinally you have been programming very well</u> ... however, you have not sufficiently participated in beneficial self-help therapy programming at this time to better understand the causative factors in this particular instance, this particular crime. (BT-46:8-20) |
| <u>The most recent psychological evaluation is not totally supportive of release</u> ... and we are going to order a new psychological evaluation for this inmate's next parole consideration hearing. (BT-41/42:22-17) | <u>Psychological report was adequate</u>. (BT-46:21) <br><br> Note: The positive findings of the new psych report were not discussed in the desision. However, during the 2002 hearing the panel was sure to discuss the "negative" aspects of the report during the decision portion of the hearing. |
| As far as parole plans go, <u>he does have a number of letters from friends and family</u>. And also a document from family members in Mexico that indicate they will assist him in all his needs, if paroled in that country. (BT-42:17-22) | <u>Parole plans were questionable for us, at least for me anyway, in terms of you have a US INS hold</u>. There was a letter from before, but at this point your mother is deceased. There are no letters form folks in mexico that will determine or help to clarify your existence in Mexico ... (BT-46/47:21-1) |

DECISION
2002 HEARING

And we make the following findings: <u>That the inmate needs to continue on the path that he's on.</u> He needs to continue participating in any and all self-help and therapy programming that may become available ... He should be commended for his participation in AA and NA programming ... He has had good work reports. These positive aspects of his behavior do not outweigh the factors of unsuitability. (BT-42/43:24-11)

And <u>we recommend that you remain disciplinary free.</u> That you just continue doing wath you are doing, Sir. <u>We can't ask you to do more.</u> I think it would be unreasonable to expect you to complete a vocation at this point. And you may never achieve a GED, but we certainly appreciate the effort that you are making in your quest for mastering the English language. Continue your participation in self-help and therapy programming, whatever becomes available. (BT-43:12-22)

DECISION
2003 HEARING

The panel makes the following findings, <u>that the prisoner still needs some self-help and therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner,</u> as I mentioned, to better understand the causative factors, Mr. Guzman ... And until progress is made, the prisoner continues to be unpredictable and a threat to others. (BT-47:9-21)

Note: These findings are contradicted by both the Psych Report and the Counselor's Report.

Recommendations are to <u>continue to remain disciplinary-free,</u> which is not a problem, it doesn't appear to be, has never been for you in that regard. <u>But educationally, to go ahead and complete that GED at this time,</u> whatever the time is available for you to do so. And if it's available to you, Mr. Guzman, <u>continue to participate in self-help therapy, whatever may be available, to understand these causative factors, as I've mentioned earlier.</u> (BT-47/48:22-5)

During the November 4, 2003, hearing Petitioner's Counselor testified as follows:

SUMMARY:

"Considering the commitment offense, prior record and prison adjustment, no CDC 115s or CDC 128As since his reception into CDC, this writer believes Guzman would pose a low degree of threat to society if released from prison at this time."

Dr. Hewchuk, Staff Psychologist at CTf, testified as follows:

"Inmate Guzman does not fit the stereotype of a habitual criminal. Due to his advanced age, and total institutional compliance during incarceration, he poses an extremely low risk if released to the community. He has openly acknowledged his history of alcohol abuse and poor judgment, and has spent the past 15 years actively working towards change. He has good insight into his prior behavior, and is fully remorseful for his offense."

Based on the above, Petitioner can only conclude that his hearing was adjudicated pro-forma and that the BPT's decision was arbitrary and capricious. There is no evidence to support a finding that "the prisoner continues to be unpredictable and a threat to others." (BT-47:19-21).

Petitioner submits that the panel violated the intent of the legislature, codified in Penal Code 3041 and ignored the rulings in In re Ramirez (2001) 94 C.A.4th 459, McQuillion v. Duncan (2002) US APP LEXIS 20350, and Briggs v. Terhune 2003 DJDAR 7245.

Petitioner respectfully requests that this Court take judicial notice of his previous writ in this matter, BH 002211, the attached reports and the entire transcript of his latest hearing to determine if judicial intervention is necessary in this case. Petitioner's health is deteriorating and he is afraid he may not make it to too many more hearings. He is now 73 years old.

**GROUND 2. PETITIONER HAS BEEN DENIED HIS RIGHT TO A COMPLETE AND MEANINGFUL REVIEW OF HIS CLAIMS IN VIOLATION OF STATE AND FEDERAL DUE PROCESS. THE SUPERIOR COURT HAS FAILED TO ADDRESS THE ISSUES RAISED BY PETITIONER IN GROUND 1. IT CANNOT BA SAID THAT PETITIONER RECEIVED THE LEGAL PROCESS TO WHICH HE IS CONSTITUTIONALLY ENTITLED BASED ON THE ORDER ISSUED AND THE COURT'S HANDLING OF THE WRIT. (US CONST. AMEND. XIV; HICKS V. OKLAHOMA (1980) 447 US 343, 346)**

Petitioner has been in prison since 1990 as the result of a second degree murder conviction. The case stems from the death of Mr. Pasquel Garcia, who died from two gun shot wounds inflicted by Petitioner, during a drunken fugue.

The incident occurred in November of 1988. The facts can be found in the attached transcript of the hearing. He became eligible for parole on April 27th, 2000. As is customary, he was denied parole at his initial hearing in violation of the mandates of Penal Code section 3041, in spite of a stellar record and the fact that as an illegal alien he is subject to being deported upon a finding of suitability for parole.

At his most recent parole consideration hearing, held September 25, 2002, the Board again found Mr. Guzman unsuitable for parole stating that he posed an unreasonable risk of danger to society if released from prison, that the offense was carried out in a cruel manner, with a callous disregard for human suffering and the motive for the crime was trivial. (See Ground 1.)

Petitioner disagreed with the Board's findings and filed an administrative appeal and a writ of habeas corpus in Los Angeles Superior Court. The writ was filed on January 7, 2003 (even though the Court's order says it was filed on September 25, 2002). The Court initially transferred the writ to Monterey County Superior Court for a response. Monterey County declined jurisdiction and sent the writ back to Los Angeles County. Los Angeles County then contacted Petitioner and indicated that because of the large number of writs being filed in that Court, a response would not be forthcoming until sometime in May 2003. Petitioner, a lay person in law, does not know whether or not the Court was authorized by law to do this, but decided to wait rather than engage in further litigation.

The Los Angeles Superior Court has now responded to Petitioner's writ and has said in essence that because Petitioner has a hearing coming up in September of 2003, the Court now declines to address the issues presented in his writ and reiterated in Ground 1 of the instant petition. (See attached order)

Petitioner submits that the Los Angeles Superior Court has violated his right to due process of law by its handling of his writ of habeas corpus. Further, to ask Petitioner to wait for another hearing is not an appropriate remedy allowed under habeas corpus litigation. Particularly when it is well known that the Board is not following the law. Petitioner is a 72-year old illegal alien for whom time is of the essence. He has difficulty hearing and seeing. He would like to go back to his native country where he can avail himself of the care and affection of his family given his advanced age and numerous ailments.

The Los Angeles Superior appears to only have given the writ a perfunctorily review of the type criticized in **Rose v. Superior Court** (2000) 92 CR2nd 313.

In **Rose**, the Court stated the following:

"The ever-growing number of individuals serving extensive sentences in penal institutions poses special problems for our Courts. As observed by Justice Mosk in his concurring opinion, 'The increasing length of prison terms for violent crime also requires a highly reliable fact finding procedure in determining guilt ... ' For the same reasons , courts have the formidable task to properly review the multifaceted arguments tendered by an ever increasing number of habeas petitioners."

The Court went on to say: "The consideration of a habeas petition is, therefore, to be regarded as something more than a formal ritual or a procedural nuisance. This caveat is particularly significant here ... The trial court must do more than perfunctorily peruse the petition ... An imprisoned defendant is entitled by due process to reasonable access to the courts ... (**In re Sanders** (1999) 21 Cal.4[th] 697, 719) ... Efficiency is not more important than preserving the constitutional integrity of the judicial process ... (Aetna Life Ins. Co. v. Superior Court (1986) 182 cal.App.3d 431, 437 ... Neither a heavy caseload, nor disaffection with our order, justified ... due consideration of his habeas petition."

It is well settled that "the proceedings in appellant tribunal are to be regarded as part of the process of law under which he is held in custody by the state, and to be considered in determining any questions of alleged deprivation of his life or liberty contrary to the 14[th] Amendment." **Frank v. Magnum** (1919) 237 US 309, 327.

Petitioner prays that this Court take this writ seriously and consider the requests presented in his PRAYER FOR RELIEF attached to Ground 1 of this petition. An evidentiary hearing is requested or in the alternative that the Court issue an order of immediate deportation. There is no evidence that Petitioner constitutes a threat to public safety.

12. Other than direct appeal, have you _____ any other petition, applications, or motions w_____ respect to this conviction, commitment, issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13.a.  (1) Name of court: _____

      (2) Nature of proceeding (for example, "habeas corpus petition"): _____

      (3) Issues raised: (a) _____

            (b) _____

      (4) Result (*Attach order or explain why unavailable*): _____

      (5) Date of decision: _____

  b.  (1) Name of court: _____

      (2) Nature of proceeding: _____

      (3) Issues raised: (a) _____

            (b) _____

      (4) Result (*Attach order or explain why unavailable*): _____

      (6) Date of decision: _____

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims petition. (See *in re Swain* (1949) 43 Cal.2d 300, 304.)

_____

_____

16. Are you presently represented by counsel? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☐ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true and correct.

Date: ✗ 10/30/06 ▶ *Jose Guzman*
                              (SIGNATURE OF PETITIONER)

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____ Jose Guzman _____, declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

_____ Jose Guzman _____, CDCR #: __ E-53800 _____
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: __ FW-205U ____
SOLEDAD, CA  93960-0689.

On _____ October 30, 2006 _____, I served the attached:

PETITION FOR WRIT OF HABEAS CORPUS

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.
Executed on _____ 10/30/06 _____.

Jose Guzman

X Jose Guzman
Declarant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FILED

OCT 2 8 2006

MICHAEL W. WYKING
CLERK US DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE GUZMAN,                                No. C 05-1732 SI (pr)

        Petitioner,                        **JUDGMENT**

    v.

A. KANE, warden,

        Respondent.

_____

    This action is dismissed without prejudice to petitioner filing a new action after he exhausts state judicial remedies for his claims.

    IT IS SO ORDERED AND ADJUDGED.

DATED: October 2?, 2006

                             SUSAN ILLSTON
                       United States District Judge

United States District Court
For the Northern District of California

FILED

OCT 2 5 2006

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE GUZMAN,                                           No. C 05-1732 SI (pr)

        Petitioner,                                    **ORDER OF DISMISSAL**

        v.

A. KANE, warden,

        Respondent.

_____/

     Jose Guzman, a prisoner at the Correctional Training Facility in Soledad, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the November 2003 decision of the Board of Prison Terms ("BPT") that he was not suitable for parole. After the court denied respondent's motion to dismiss for lack of subject matter jurisdiction, respondent filed an answer and petitioner filed a reply brief. The parties' briefings show that state judicial remedies have not been exhausted for the claims presented in the petition. The action must be dismissed without prejudice to Guzman filing a new action after he exhausts his state judicial remedies.

     The exhaustion rule requires that prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement first exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b),(c); Rose v. Lundy, 455 U.S. 509, 515-16 (1982); Duckworth v. Serrano, 454 U.S. 1, 3 (1981). The exhaustion-of-state-remedies doctrine reflects a policy of federal-state comity to give the state "'the initial "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Picard v. Connor, 404 U.S. 270, 275 (1971) (citations omitted).

1    Guzman did file a petition for writ of habeas corpus in the California Supreme Court, but

2  it was rejected for a procedural reason that shows it is unexhausted.  The California Supreme

3  Court rejected Guzman's habeas petition without discussion but with a citation to <u>People v.</u>

4  <u>Duvall</u>, 9 Cal.4th 464 (Cal. 1995).  <u>See</u> Petition, Exh. A.  Under California law, a denial of a

5  habeas petition with a citation to <u>Duvall</u> indicates that a petitioner has failed to state his claim

6  with sufficient particularity for the state court to examine the merits of the claim, and/or has

7  failed to "include copies of reasonably available documentary evidence supporting the claim,

8  including pertinent portions of trial transcripts and affidavits or declarations." <u>Duvall</u>, 9 Cal.4th

9  at 474.  This court cannot determine whether it was the first or second problem or both problems

10  identified in <u>Duvall</u> that caused the rejection of Guzman's petition because his state habeas

11  petition is not in the record..  In any event, both problems are curable defects that can be cured

12  in a renewed state petition.  Cf. <u>Kim v. Villalobos</u>, 799 F.2d 1317, 1319 (9th Cir. 1986) (a state

13  petition denied with a <u>Swain</u> citation, which stands for the proposition that a petitioner has failed

14  to state his claim with sufficient particularity and has failed to explain the reasons for any delay

15  in filing, can be cured in a renewed petition).  State judicial remedies are not exhausted in such

16  a case.  <u>See id.</u>  Here, Guzman can exhaust by filing a new habeas petition in the California

17  Supreme Court that states his claim with sufficient particularity and attaches the transcript from

18  the BPT hearing.

19    The petition must be dismissed because it has no claims as to which state court remedies

20  have been exhausted.  This court cannot grant habeas relief on any unexhausted claim.  28

21  U.S.C. § 2254(b).  The action will not be stayed while Guzman exhausts his state court remedies

22  because the petition does not contain any exhausted claims.  Guzman is urged to <u>act swiftly</u> to

23  exhaust his state court remedies and immediately file a new federal habeas petition after he

24  receives a decision from that court to avoid running afoul of the one-year statute of limitations

25  on the filing of federal habeas petitions, 28 U.S.C. § 2244(d).

26    The action is dismissed without prejudice for failure to exhaust state court remedies.  The

27  clerk shall close the file.  Because this action is now closed, when petitioner files his new federal

28  habeas petition, he should <u>not</u> use the case number for this action and instead should file the

2

1   petition as a new action, i.e., he should send the petition to the court without a case number and

2   the court will assign it a new case number when the petition is filed.

3          IT IS SO ORDERED.

4   DATED:  October 20, 2006

_____
SUSAN ILLSTON
United States District Judge

United States **District Court**
For the Northern District of California

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


GUZMAN,

              Plaintiff,

   v.

KANE et al,

              Defendant.
_____/

Case Number: CV05-01732 SI

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 23, 2006, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Jose Guzman
Correctional Training Facility
E-53800
P.O. Box 689
Soledad, CA 93960

Julia Je
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

Dated: October 23, 2006

                        Richard W. Wieking, Clerk
                        By: Tracy Sutton, Deputy Clerk

S125322

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re JOSE GUZMAN on Habeas Corpus

---

Petition for writ of habeas corpus is DENIED. (See *People v. Duvall* (1995) 9 Cal.4th 464.)

SUPREME COURT
**FILED**

MAR 2 3 2005

Frederick K. Ohlrich Clerk

DEPUTY

Chief Justice

Name    JOSE GUZMAN

Address    P.O. BOX 689   FW-205u

SOLEDAD, CA

93960-0689

CDC or ID Number    E53800

**COPY**

SUPREME COURT
**FILED**

JUN – 4 2004

Frederick K. Ohlrich Clerk

_____
DEPUTY

**RECEIVED**

JUN 4 – 2004

CLERK SUPREME COURT

CALIFORNIA SUPREME COURT

*(Court)*

---

JOSE GUZMAN,
Petitioner

vs.

CA BOARD OF PRISON TERMS,
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No.    **S125322**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS — READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

# EXHIBIT A
(PSYCHOLOGICAL REPORTS)

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
OCTOBER 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 7, 2002

Inmate Jose Guzman, CDC# E-53800, was seen for a
psychological evaluation for the Board of Prison Terms by
Steven J. Terrini, Ph.D., Staff Psychologist at the
Correctional Training Facility (CTF), on 12/18/98 for the
March 1999 Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BZ/gmj

D:  06/07/02
T:  06/07/02

GUZMAN        E-53800        CTF-CENTRAL        06/07/02        gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
MARCH 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 18, 1998

This is the third psychological evaluation for the Board of
Prison Terms on inmate Jose Guzman. This report is the
product of a personal interview, conducted on 12/18/98, as
well as a review of his Central file and unit health record.
This interview was a single contact with this inmate for the
sole purpose of preparing this report. The interview was
translated by a bilingual interpreter.

I.    IDENTIFYING INFORMATION:

      Inmate Guzman is a 68-year-old, married, Hispanic
      male. His date of birth is 09/28/30. He stated his
      religion is Catholic. He has no unusual physical
      characteristics and he denied a history of nicknames
      or aliases.

II.   DEVELOPMENTAL HISTORY:

      He denied any history of birth defects, abnormalities
      of developmental milestones, a history of cruelty to
      animals or a history of arson, a significant childhood
      medical history, and a history of physical or sexual
      abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Guzman had no formal education as a child. He
      is currently in the educational program here at CTF
      and hopes to eventually begin working on his GED. His
      grade point level was measured in 1997 at 5.7.

IV.   FAMILY HISTORY:

      His mother is still alive and is 85 years old. He has
      14 siblings and has contact with most of them. One of
      his sons is in prison at this time. He denied that
      any other family members ever had any significant
      criminal, substance abuse or psychiatric problems.

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

      Inmate Guzman is heterosexual. He denied any history
      of sexual aggression or high-risk sexual behavior.

GUZMAN      E-53800      CTF-CENTRAL      12/23/98      gj

GUZMAN, JOSE
CDC NUMBER:  E-53800
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

VI.    MARITAL HISTORY:

Inmate Guzman has been married for 36 years and has
six children by this marriage.  He is in contact with
them, especially with frequent phone calls.

VII.   MILITARY HISTORY:

The inmate denied any military history.

VIII.  EMPLOYMENT AND INCOME HISTORY:

He has work experience as a cook in a restaurant.
When he paroles, he hopes to have his own business in
the future.

IX.    SUBSTANCE ABUSE HISTORY:

Inmate Guzman acknowledged a significant problem with
alcohol, as he was intoxicated during the commitment
offense.  He attends Alcoholics Anonymous currently.

X.     PSYCHIATRIC AND MEDICAL HISTORY:

He denied a history of significant medical problems,
serious accidents or head injuries, suicidal behavior
or seizures.  He had one surgery to amputate one of
his toes in the past.

XI.    PLANS IF GRANTED RELEASE:

When he paroles, he will return to Mexico, where he
owns his own home, and be reunited with his family.
It would appear his parole plans are viable and his
prognosis for community living is fair.

CLINICAL ASSESSMENT

XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Guzman appeared his stated age.  He was
appropriately dressed and groomed.  His speech, flow
of thought and affect were all generally within the
normal range.  He was cooperative and alert.  His

GUZMAN      E-53800      CTF-CENTRAL      12/23/98      gj

GUZMAN, JOSE
CDC NUMBER:  E-53800
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

intellectual functioning was estimated to be within
the average range.  His judgment appeared to be
normal.  He demonstrated no insight into his
commitment offense.  There was no evidence of
a mood or thought disorder.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      1)  Alcohol Abuse/Dependence, in
                 institutional remission.
             2)  Adult Antisocial Behavior.
AXIS II:     No Contributory Personality Disorder.
AXIS V:      GAF = 85.

It would appear his prognosis is positive for being
able to maintain his current mental state in the
community upon parole.

XIII.  REVIEW OF LIFE CRIME:

Inmate Guzman was able to describe some of the
circumstances surrounding his commitment offense.  He
stated he actually remembers nothing of the crime
itself and feels that it was an accident.  He said he
was very drunk and undoubtedly lost complete control
of himself.  He understands that he has ruined many
lives, including the lives of his family, as well as
the victim's family, and knows that the damage will
never be removed.  His remorse appeared to be rather
superficial.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  In consideration of several factors, including his
    lack of any criminal history, his lack of a
    violent criminal history, his lack of any CDC-115
    violations or CDC-128-A violations, his lack of
    any violent CDC-115 violations and his advanced
    age, his violence potential within a controlled
    setting is considered to be significantly below
    average relative to this Level II inmate
    population.

B.  If released to the community, his violence
    potential is estimated to be roughly average
    relative to the average citizen in the community.



GUYZMAN        E-53800        CTF-CENTRAL        12/23/98        gj

GUZMAN, JOSE
CDC NUMBER:  E-53800
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

    C.    Clearly, the most significant risk factor for this inmate as a precursor to violence would be continued abuse of alcohol.  Were he to begin drinking again, his violence potential would be considerably higher than the average citizen in the community.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

1) This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards and has generally done so during his incarceration period.

2) This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

3) As this man has acknowledged a past problem with alcohol, abstinence from all alcohol and drugs, monitoring, and attendance at self-help groups such as Alcoholics Anonymous should be mandatory conditions of parole.

4) He should be encouraged to continue his education to improve his English.

STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

SJT/gj

d:  12/18/98
t:  12/23/98

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
AUGUST 1996 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 17, 1996

This is the second psychological evaluation for the Board of
Prison Terms on inmate Jose Guzman.  This report is the product
of a personal interview, as well as a review of his Central file
and medical record.  Because he does not speak English very well,
an interpreter was used to translate for inmate Guzman.

His crime consisted of the 1988 shooting of a man for no apparent
reason.  He had been drinking heavily.  He fell in love with the
man's daughter--his daughter-in-law--and he stopped by her house
to ask her to "run away" with him.  When her father came out to
talk to him, inmate Guzman shot him.  He says he can't remember
doing it.  He expressed his regret.

He has had a good record with the Department of Corrections,
having no CDC-115 infractions during his incarceration.

He had an alcohol problem prior to his incarceration and attends
Alcoholics Anonymous now.  Educationally, he said that he had no
formal education at any time, anywhere, but he did teach himself
to read and write a little.  Vocationally, he has worked as a
cook and a restaurant manager.  His future plans include
returning to Mexico to live with his family and engage in
business.  His mother has a ranch that he can live on.

MENTAL STATUS EXAMINATION:  Inmate Guzman is a well developed,
well nourished man of medium build who appeared to be his stated
age of 65.  He was appropriately dressed and groomed, and seemed
to be fully cooperative during the interview.  His speech was
clear and readily understandable in Spanish.  His affect was
normal.  His flow of thought was normal with no hallucinations
nor delusions noted.  He seemed to be fully oriented with normal
intellectual functioning.  His attention and concentration were
good.  His insight and judgment appear to be much better than
they were at the time of his offense.

GUZMAN        E-53800        CTF-CENTRAL        06/04/96        gj

GUZMAN
E-53800
Page Two


PSYCHIATRIC DIAGNOSIS - DSM-IV:

AXIS I:     Alcohol Abuse, in remission.
AXIS II:    No contributory personality disorder.
AXIS III:   No contributory physical disorder.

PSYCHIATRIC CONCLUSIONS:  His diagnosed psychopathology may be
directly related to his offense.  It appears it would not have
happened had he known what he was doing, since he knew and liked
the man that he killed and he had no reason to shoot him.  He
does not now have a psychiatric condition which would benefit
from mental health treatment following his release.  He is
showing improvement in his behavior;  now being sober seems to
help a great deal.  If released, I expect him to be able to
maintain the gains he has made, provided he continues in his
determination to avoid alcohol.

SUGGESTED ACTIONS:  If he is to be continued in his present
program, he should be encouraged to continue his participation in
Alcoholics Anonymous and to gain some viable vocational training
so that he can get a good job upon his release.  If he is
considered for parole, his level of dangerousness is likely to be
less than for the average inmate.  Conditions for parole should
include no alcohol.

RECOMMENDATION TO CLASSIFICATION COMMITTEE:  Until released, he
should:  1)  Continue to attend Alcoholics Anonymous.  2)  Gain
some useful vocational training which will enable him to get work
upon his release.


*Bruce Bakeman, PhD.*
BRUCE M. BAKEMAN, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad


GUZMAN        E-53800        CTF-CENTRAL        06/04/96        gj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
DOCUMENTATION HEARING/JUNE 1993
C.S.P./CORCORAN

Inmate Guzman was psychologically evaluated on May 21, 1993.  This will be
the first mental health consultation forwarded to the paroling authority.

Inmate Guzman was evaluated for approximately 75 minutes; his Central file
and Medical File were reviewed.  The purposed of this single contact was
for this report only.

Inmate Guzman had previously requested that a Spanish speaking interpreter
be utilized for this appointment (see chrono dated 5/17/93).  For this
purpose Gloria Castillo, OA was utilized; Inmate appeared to understand
questions posed to him by the interpreter and appeared to give relevant
answers through the translation process.  He appeared satisfied with the
interpretation and no difficulties were noted or expressed.

Inmate Guzman was received at CSP/Corcoran on January 21, 1993.  This
62-year-old, first termer was originally received in CDC on 04/26/90 from
L.A. County for the commitment offense of murder second, with two
additional counts of ADW and a two year enhancement for use of a weapon
(total term = seventeen years to life).  Prior arrest history consisted of
illegal entry and there is presently a U.S. INS Hold #A70145432 in place.
There is no evidence suggestive of arson/sex/escape histories noted.

Institutional adjustment revealed a clear disciplinary file.  He was noted
to be medically fit for all duties and fit for food handling.  He stated h
is presently on a waiting list for academic programming.

The instant offense occurred on 12/25/88 and he was arrested on the same
day.

Inmate declared amnesia secondary to alcohol abuse and was unable to give
relevant comments with regard to the instant offense.  He provided the
following chronologically of events that led up to the instant offense.
Earlier that day (12/25/88) he had opened up the restaurant where he worke
at approximately 7 o'clock in the morning; he was the cook and in charge o
petty cash.  Approximately one and half hours later he went to a near by
tailor shop and began drinking tequila with the owner of that shop
(approximately 20 feet from his restaurant location).  He stated that
during the course of his work day he consumed approximately five half pint
of tequila.  He closed the restaurant (taco stand) and took his niece to
her house which was approximately 10 to 15 minutes away.  Afterwards, he
purchased some beer and went to a friends house to celebrate the holiday.
He began cooking some food and the friend had not arrived yet; however,
other family members were present.  Eventually, the friend came home with
some tequila which was allegedly carried in a washed out antifreeze
container; the tequila was allegedly brought over from Tijuana.  He drank
approximately six ounces of this tequila; it was described as a strong
drink.  At one point, Inmate asked the friend's daughter to place a call t
Mexico in order for Inmate to talk to his wife.  They talked for 15 to 20
minutes and she had declared that she was not going to be coming to the
United States on the 26 of December which they had previously thought abou
planning for.

When he learned this he stated he felt bad that she wasn't coming.  He
stated he had no continuous recall after talking with his wife.  The next
thing he was aware of was being handcuffed in the police station and the
cuffs were too tight.  As he asked the police officer to loosen his cuffs
he was told that he was a dangerous person and that he had discharged
rounds at someone resulting in her death.  He stated he had no knowledge of
these events.

Essentially, he stated that he doesn't believe he shot anybody but the
police report says that he admitted to it.  He stated that he can't believe
that he took his friend's life.

When asked whether he owned any weapons he stated that he had purchased a
weapon on the streets, kept it at home and never carried it.  He had no
idea of how he retrieved the weapon.  He had no idea of the number of
rounds fired at the victim.

Inmate stated that he had been binge drinking since approximately December
6, 1988 and this was allegedly on a daily basis.  Upon further inquiry it
was determined that Inmate had previously known that his wife was not going
to be in the United States during the holidays and this was reported to him
on December 5, 1988 (approximately three days after his wife had gone to
Mexico).  Thereafter, when attempting to clarify Inmate Guzman's alcohol
intake history his self report appeared to be vague, evasive, and
inconsistent.  He attempted to portray himself as a modest consumer of
alcohol from the age of 14 through 1976.  However, he then stated that he
was essentially a mild and modest consumer of alcohol up until the date
that he learned that his wife was not coming back to the United States over
the holidays (December 6, 1988).  He stated that his excessive drinking was
related to the instant offense only; he denied ever having a previous
black-out.  He acknowledged heavy drinking during December.  However, upon
further inquiry it was learned that he often had periods of consuming
alcohol and being physically ill (vomiting) well before the instant offense
in December 1988.  This type of self report is considered somewhat unusual
since he had been involved in Alcoholics Anonymous while being housed at
Techachapi.

The circumstances of the instant offense were reviewed in the Central File
and the reader is respectfully referred to these elements.  Inmate Guzman
denied any family distress or family dysfunction related to the victims
daughter and his own son (as reported in the Central File).  Aside from
being upset from his wife's absence over the holidays he denied any
difficulties with the grandchild from the non-wed union between Inmate's
own son and the victim's daughter.  He did not elaborate upon any emotional
attachment that he developed with the victims daughter.  He acknowledged
that the victim's daughter was planning to marry another man but stated
that he had no difficulty in accepting her plans.

Inmate stated that he had never had a negative reaction to alcohol abuse on
previous occasion; he was convinced that the tequila which was allegedly
poured from a washed out antifreeze container had been the source of his
difficulties which led to the murder of the victim.

Brief background and history was noted as follows.  Inmate is the first of 14 children born to, and raised by, natural parents in Mexico.  Father was deceased in 1983.  Mother and two siblings reside in Mexico; the rest of his siblings reside in the United States.  He stated his only education wa a preschool/kindergarten type setting.  However, he acknowledged that he has the ability to read and write Spanish.  He first entered the United States in 1949 and worked in the agriculture area until 1951; at that time he left voluntarily.  In early 1953 he returned and departed at year's end again, he voluntarily left his agricultural work.  In 1970 he entered the United States an it was noted that it was his adult history charge (7/30/70) and he was deported.  However, he quickly reentered and stayed until approximately 1974.

Inmate stated that he was deported in 1974 and returned several days thereafter; however, the Central File indicated that he was deported in 1970 after being in U.S. immigration custody for several days.  From the 70's just prior to the instant offense he was working in a fabric type of business (handbag assembly), received a permit to sell items at swap meets (1979) and did some additional work in a taco stand in downtown Los Angeles.  When living in Mexico he continued in Agricultural field work.  Inmate was previously married and remains married despite his incarceration; there are six children from this union and all of his famil by marriage are in the United States at this time.  Inmate denied any marital distress despite the material found to be related to the circumstances of the instant offense.  Upon further inquiry he did acknowledge that two of his son's have had legal difficulties resulting in jail terms (gang and/or drug difficulties).  No other juvenile or adult crimes were noted and none were admitted to.

## MENTAL STATUS EXAMINATION:

Mental Status examination revealed an alert, generally cooperative man who appeared his stated age and was in no acute distress.  The sensorium was clear and his cognitive functions were grossly intact.  He appeared to be in good health and in good spirits.  His speech was reported to be conversational and his choice in usage of words was appropriate.  Accordin to the interpreter, he had displayed no difficulty with receptive or expressive language function.  As was previously noted, Inmate Guzman provided an inconsistent history with regard to alcohol intake; this appeared to be a minimizing and rationalizing type of maneuver.  Mood was normal and affect was flexible and appropriate to this given circumstance. He was neither suicidal nor homicidal.  There was no evidence suggestive o overt psychopathology or cerebral dysfunction.  Remorse issues appeared to be somewhat superficial and Inmate Guzman remained in somewhat of a state of denial since he alleged that he had no recall of the instant offense an related this to excessive alcohol consumption.  Insight was poor and judgment was good in this structured environment.

## DIAGNOSIS:

AXIS I          Alcohol Abuse, by history, currently in institutional
                remission.
                Adult Antisocial Behavior.

AXIS II         None noted.

GUZMAN   Jose   E 53800   3B    BOARD OF PRISON TERMS    C.S.P./CORCORAN

RECOMMENDATIONS:

1.  Inmate Guzman is competent and responsible for his own behavior and actions.

2.  He has the capacity to abide by institutional standards and his motivation to do so will be evident during the course of his incarceration.

3.  There is no evidence suggestive of overt psychopathology or cerebral dysfunction; he neither requested nor required further mental health intervention at this time.

4.  Violence potential is considered to be less than average when compare to similarly incarcerated adult inmates. However, the alcohol abuse history and his reporting of it was of concern; violence potential is considered to be very unpredictable since attention to alcoholic tendencies has not been dealt with thoroughly. It was surprising tha despite his AA involvement in Techachapi, that he continued to espous such an inconsistent alcohol abuse history. He will need extensive A involvement. He declared since he was on close custody he was unable to attend meetings. However, he was directed to obtain the Spanish language version of Alcoholics Anonymous and to prepare with this written material while he is waiting for a lesser custody level which would permit AA involvement. He will certainly need to come to grips with his alcohol abuse history and this should be much more clear by the next time he has a mental health consultation for the paroling authority.

5.  Academic programming is deficient and this, too, will need to be sufficiently upgraded especially with regard to his receptive and expressive English language skills.

6.  It appears that Inmate Guzman has not fully explored the commitment offense nor come to terms with its underlying causes. Disparities were noted between his self report and that which was noted in the Central File (circumstances of instant offense). Perhaps, this will be clarified during his involvement with Alcoholic Anonymous.

7.  Programming factors will need to be based on custody issues rather than on mental health factors at this time.


cc:  C-File
     Medical Record


                                        B.T. REED, Ph.D.
                                        Clinical Psychologist

BTR:rds

Date of Interview: May 21, 1993

GUZMAN, Jose  E-53800  3B  BOARD OF PRISON TERMS  C.S.P./CORCORAN

# EXHIBIT B
(TRANSCRIPT OF NOV. 4, 2003 HEARING)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration ) CDC Number E-53800
Hearing of: )
                          )
JOSE GUZMAN                )
                          )
_____ )

COPY
INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 4, 2003

9:00 A.M.

PANEL PRESENT:

JONES MOORE, Presiding Commissioner
PEGGY BACHLOR, Deputy Commissioner

OTHERS PRESENT:

JOSE GUZMAN, Inmate
DAVID SPOWART, Attorney for Inmate
ANDREA POTT, Deputy District Attorney
JOSE ZAVALA, Spanish Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No                    See Review of Hearing
_____ Yes                   Transcript Memorandum

Carol A. Edwards              Capitol Electronic Reporting

ii

## INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 11 |
| Pre-Commitment Factors | 16 |
| Post-Commitment Factors | 19 |
| Parole Plans | 24 |
| Closing Statements | 36 |
| Recess | 43 |
| Decision | 44 |
| Adjournment | 49 |
| Transcriber Certification | 50 |

--oOo--

1

<pre>
 1                P R O C E E D I N G S
 2         DEPUTY COMMISSIONER BACHLOR:  We're
 3    rolling.  We're on the record, Sir.
 4         PRESIDING COMMISSIONER MOORE:  All right.
 5    This would be a Subsequent Parole Consideration
 6    Hearing for Jose Guzman, G-U-Z-M-A-N, CDC number E-
 7    as in Edward 53800.  The date of the hearing would
 8    be Tuesday, November the 4th, 2003.
 9         DEPUTY COMMISSIONER BACHLOR:  Commissioner,
10    he understands English, I believe.
11         PRESIDING COMMISSIONER MOORE:  Yes, but
12    does he have a problem hearing?  Can you hear us
13    okay?
14         INMATE GUZMAN THROUGH INTERPRETER:  A
15    little.  I have difficulty understanding English.
16         PRESIDING COMMISSIONER MOORE:  Okay.  But
17    when he speaks Spanish to you, you can hear him
18    clear enough to understand?
19         INMATE GUZMAN THROUGH INTERPRETER:
20    (Indiscernible).
21         PRESIDING COMMISSIONER MOORE:  Okay, that's
22    fine.  I just saw you kind of talking into his ear.
23    I wanted to make sure he didn't need a hearing
24    device or aid or anything.  Okay.
25         INTERPRETER ZAVALA:  Would you prefer that
26    I --
27         PRESIDING COMMISSIONER MOORE:  No, no,
</pre>

2

1    you're fine.  You're fine.  I just -- in my review,

2    and I'll get to that further under the ADA

3    concerns, but in my review I didn't see anywhere

4    where he had some -- a hearing problem or anything

5    -- concern of that.  So I just wanted to make sure

6    before we got started further.  So this would be

7    November the 4th, 2003.  The time is approximately

8    0900 hours.  The location, the Correctional

9    Training Facility at Soledad.  The legal status of

10   the prisoner, the date the prisoner was received,

11   would be April 26th of 1990.  The date the life

12   term started would be April 28th of 1990 from the

13   county of Los Angeles.  The offense would be murder

14   second with the use of a deadly weapon and assault

15   with a deadly weapon, case number A- as in Alpha

16   980858.  And I have Counts One, Two, and Three.

17   Penal Code section violated would be 187, 12022

18   point five A, and 245A1.  The term would be 17 to

19   life.  The minimum eligible parole date would be

20   April 27th of 2000.  And as I mentioned, the

21   assault with a deadly weapon, 245A1, same county,

22   same case number, and that's Count Two.  And then

23   the use of a firearm, 12022 point five, same

24   county, same case number, and that's also Count

25   Two.  And then I have another assault with a deadly

26   weapon, 245A1, same county, same case number, and

27   that's Count Three.  This hearing will be tape-

3

1    recorded, Mr. Guzman, and for voice recognition

2    purposes we will state our full name, spelling our

3    last name, stating the purpose of our business.

4    When it's your turn, if you'd add your CDC number

5    please. We'll go around the room to my left. My

6    name is Jones Moore, M-O-O-R-E, Commissioner, Board

7    of Prison Terms.

8         DEPUTY COMMISSIONER BACHLOR:  Peggy

9    Bachlor, B-A-C-H-L-O-R, Deputy Commissioner, Board

10   of Prison Terms.

11        DEPUTY DISTRICT ATTORNEY POTT:  Andrea

12   Pott, P- as in Paul O-T-T, Deputy District Attorney

13   with Los Angeles County.

14        PRESIDING COMMISSIONER MOORE:  Thank you.

15        ATTORNEY SPOWART:  David Spowart,

16   S-P-O-W-A-R-T, attorney for Mr. Guzman.

17        INMATE GUZMAN:  Jose Guzman, J-O-S-E

18   G-U-Z-M-A-N.

19        ATTORNEY SPOWART:  Serial number.

20        INMATE GUZMAN:  E-53800.

21        INTERPRETER ZAVALA:  Jose Zavala,

22   Z-A-V-A-L-A, Spanish Interpreter for Mr. Guzman.

23        PRESIDING COMMISSIONER MOORE:  Do you

24   solemnly swear to translate from English to

25   Spanish, Spanish to English for this hearing today?

26        INTERPRETER ZAVALA:  I do.

27        PRESIDING COMMISSIONER MOORE:  Thank you.

4

1    And Mr. Guzman, that identifies everyone in the

2    room except for the presence of two correctional

3    peace officers who are here strictly for safety

4    security measures, and they'll play no role in

5    today's proceedings.  Now, I'm going to ask you

6    some questions in regards to the Americans with

7    Disabilities Act.  Are you familiar with that?

8              INMATE GUZMAN THROUGH INTERPRETER:  No.

9              PRESIDING COMMISSIONER MOORE:  Okay.  You

10   filled out a form -- let me see -- June the 7th of

11   2002, and it said you had no disabilities as

12   defined by the Americans with Disabilities Act.

13   However, you did have a problem or concerns with

14   the language, so you asked (indiscernible) a

15   Spanish interpreter.  One has been provided for

16   you.  Is that correct?

17             INMATE GUZMAN THROUGH INTERPRETER:  Yes,

18   Sir.

19             PRESIDING COMMISSIONER MOORE:  All right.

20   But in terms of walking and getting here, you got

21   here under your own power today?

22             INMATE GUZMAN THROUGH INTERPRETER:  I'm

23   fine, yes, Sir.

24             PRESIDING COMMISSIONER MOORE:  Okay.  And

25   we already asked you about hearing.  You don't have

26   any hearing problems?

27             INMATE GUZMAN THROUGH INTERPRETER:  No,

5

1    Sir.

2              PRESIDING COMMISSIONER MOORE:   And you

3    brought your glasses so you can read.

4              INMATE GUZMAN THROUGH INTERPRETER:   Yes, I

5    do have difficulties with my sight.

6              PRESIDING COMMISSIONER MOORE:   And are you

7    on any psychotropic meds?

8              INMATE GUZMAN THROUGH INTERPRETER:   No.

9              PRESIDING COMMISSIONER MOORE:   All right.

10   I noted that you had a six point two reading, so

11   I'm going to ask you to read this document for me,

12   please.  Read it aloud for us.

13             INMATE GUZMAN:   In English?

14             PRESIDING COMMISSIONER MOORE:   In English.

15-            INMATE GUZMAN:   My (indiscernible) is very

16   bad.  (Indiscernible) my problem with the English

17   language.

18             PRESIDING COMMISSIONER MOORE:   Okay.  Well,

19   I know you have a great math score and language

20   score, you know.  You had a 10 point overall; 12

21   point nine in math.  But take your time.  It's not

22   a race.  Do the best you can.

23             INMATE GUZMAN:

24             "The Americans with Disabilities,

25             ADA, is a law to people with

26             disability.  Disabilities are

27             problems that take it harder for

6

1           some people to see, hear, breathe,

2           (indiscernible), talk, work, learn,

3           think, work, or take care of

4           themselves than it is for others.

5           Nobody can keep out of public places

6           or activity because of the

7           disability.  If you have a

8           disability, you have the right to

9           ask for help to get ready for

10          (indiscernible) BPT hearing, get to

11          the hearing, talk, read form and

12          paper, and understand the hearing

13          process.  BPT will look at what you

14          ask for to make sure that you have

15          disability that is covered by the

16          ADA and that you have asked for the

17          right kind of help.  If you do not

18          help or if you don't think you got

19          the kind of help you need, ask for a

20          BPT 1074 Grievance --"

21          PRESIDING COMMISSIONER MOORE:  Grievance,

22   yes.

23          INMATE GUZMAN:  "You can also get help to

24   fill it out."

25          PRESIDING COMMISSIONER MOORE:  Great, you

26   did a good job.  Now, Counselor, in my review of

27   the source documents I found no additional ADA

7

1  concerns or issues.  Would that be accurate?

2           ATTORNEY SPOWART:  I agree.

3         PRESIDING COMMISSIONER MOORE:  Okay.  Thank

4  you.  Then we'll proceed, Mr. Guzman.  The purpose

5  of today's hearing is to again consider your

6  suitability for parole.  We will consider your

7  crime, your prior criminal and social history,

8  behavior and programming since commitment.  We have

9  reviewed your Central File and your prior

10  transcripts.  You will have an opportunity to

11  correct or clarify them for the record.  We will

12  consider your progress since your last hearing, any

13  new psychiatric reports, and any other information

14  that may have a bearing on your suitability for

15  parole.  Any change in your parole plans should be

16  brought to our attention.  Before we recess for

17  deliberations the District Attorney, your attorney,

18  and you will have an opportunity to make a final

19  statement regarding parole suitability and the

20  length of confinement.  After this is done we will

21  recess, clear the room, and deliberate.  Once we've

22  completed our deliberations, then we will resume

23  the hearing and announce our decision.  The Board

24  of Prison Terms' rules and the law state that a

25  parole date should be denied if your release should

26  pose an unreasonable risk of danger to others.

27  Counselor, the prisoner has certain rights.  Have

8

1    those rights been met thus far?

2         ATTORNEY SPOWART:  Yes, they have.

3         PRESIDING COMMISSIONER MOORE:  Any

4    objections to the Panel members today?

5         ATTORNEY SPOWART:  I have none.

6         PRESIDING COMMISSIONER MOORE:  Thank you.

7    Let's see -- Mr. Guzman, you will receive a copy of

8    our written tentative decision today.  The decision

9    becomes effective in 120 days.  Copies of the

10   transcript and the decision will be sent to you and

11   you will have 90 days from that effective date to

12   appeal if you so desire.  You are not required to

13   discuss your offense, nor are you required to admit

14   to your offense.  However, the Panel does accept as

15   true the findings of the court.  Meaning that we

16   won't retry the case, we accept the facts as

17   they've been given to us here today.  Commissioner,

18   any confidential materials to be used this morning?

19        DEPUTY COMMISSIONER BACHLOR:  No, there's

20   not.

21        PRESIDING COMMISSIONER MOORE:  All right,

22   thank you.  Checklist; Exhibit number one.

23   Counsel, do you have those documents?

24        ATTORNEY SPOWART:  I have them.

25        PRESIDING COMMISSIONER MOORE:  Any

26   additional documents to submit or any preliminary

27   objections at this time?

9

1          ATTORNEY SPOWART:  I have no preliminary

2     objections.  I've got a couple of (indiscernible),

3     a recent chrono that might not be there, and scores

4     on education, and this letter.  But I see -- I

5     guess you've got the copies of letters.

6          PRESIDING COMMISSIONER MOORE:  Yes.

7          ATTORNEY SPOWART:  (Indiscernible).

8          PRESIDING COMMISSIONER MOORE:  All right.

9     And Ms. Pott, are we on the same page?

10          DEPUTY DISTRICT ATTORNEY POTT:  I'm missing

11     the supporting letters.

12          DEPUTY COMMISSIONER BACHLOR:  There's one

13     supporting letter in the file from his niece for

14     this year.  However, there's a number of supporting

15     letters in here that came after last year's hearing

16     dated 2002.  I'll cover those during my part of the

17     hearing, if that's all right.  They actually are

18     2002 letters, but they came after the last hearing.

19          DEPUTY DISTRICT ATTORNEY POTT:  Okay.

20          PRESIDING COMMISSIONER MOORE:  In your

21     packet under Notices, there was a letter from his

22     niece.

23          DEPUTY DISTRICT ATTORNEY POTT:  Right.

24          PRESIDING COMMISSIONER MOORE:  Is that

25     (indiscernible), is that in your packet?

26          DEPUTY DISTRICT ATTORNEY POTT:  No, it's

27     not.

10

1          PRESIDING COMMISSIONER MOORE:  It's not?

2          DEPUTY COMMISSIONER BACHLOR:  All right,

3    hold on.  I can give her (inaudible).

4          ATTORNEY SPOWART:  I have an extra copy

5    there.

6          DEPUTY COMMISSIONER BACHLOR:  Okay.

7          PRESIDING COMMISSIONER MOORE:  Good, thank

8    you.

9          DEPUTY DISTRICT ATTORNEY POTT:  Super,

10   thank you.

11         PRESIDING COMMISSIONER MOORE:  All right.

12   So now we're all on -- we have -- all on the same

13   page.  Great.  Then, Mr. Guzman, will you be

14   speaking with us today?

15         INMATE GUZMAN THROUGH INTERPRETER:  If I

16   have something to say, no, just only answer your

17   questions.

18         PRESIDING COMMISSIONER MOORE:  Okay.  So

19   when I ask you questions today, will you respond to

20   my questions?

21         INMATE GUZMAN THROUGH INTERPRETER:  If I

22   know the answers, yes.

23         PRESIDING COMMISSIONER MOORE:  Okay.  Raise

24   your right hand and I'll swear you in, please.  Do

25   you solemnly swear or affirm the testimony you give

26   this hearing will be the truth, the whole truth,

27   and nothing but the truth, sir?

11

1        INMATE GUZMAN:  Yes, Sir.

2        PRESIDING COMMISSIONER MOORE:  Thank you,

3    you may put your hand down now.  Counsel, if there

4    are no objections, I want to incorporate by

5    reference today the Statement of Facts from the

6    transcript of the decision that was held on May the

7    6th of 1999, pages eight through 10.

8        ATTORNEY SPOWART:  I have no objection.

9        PRESIDING COMMISSIONER MOORE:  Okay.  Then

10   we (indiscernible).  Now, let's see -- and let's

11   see -- it says that, Mr. Guzman, you were having an

12   affair with the victim's daughter, who was 38 years

13   younger than you.  It says that you wanted this

14   woman to go with you.  She refused.  Her father

15   confronted you, came out of his van, and you shot

16   him two times with a semi-automatic rifle, killing

17   him, causing his demise.  You then got out of the

18   vehicle and threatened the others that were trying

19   to get the rifle away from you, and a couple more

20   shots were fired before the gun was taken away from

21   you.  Is that accurate, Mr. Guzman?

22       INMATE GUZMAN THROUGH INTERPRETER:   I

23   couldn't tell you.  I don't know how it happened.

24       PRESIDING COMMISSIONER MOORE:  You don't

25   know how it happened?

26       INMATE GUZMAN THROUGH INTERPRETER:  No,

27   Sir.

12

 1          PRESIDING COMMISSIONER MOORE:  Why don't

 2   you know what happened or how it happened?

 3          INMATE GUZMAN THROUGH INTERPRETER:  Well,

 4   alcohol really affected me a lot.  I don't know

 5   why.  I had never suffered anything like that

 6   before.

 7          PRESIDING COMMISSIONER MOORE:  So, what

 8   you're telling us here today is that you blacked

 9   out, you had alcohol, and you don't remember.

10          INMATE GUZMAN THROUGH INTERPRETER:  For

11   several hours.

12          PRESIDING COMMISSIONER MOORE:  I see.  So

13   you don't remember shooting this Pasquale Garcia?

14          INMATE GUZMAN THROUGH INTERPRETER:  No,

15   Sir.

16          PRESIDING COMMISSIONER MOORE:  Okay.  And

17   what about the other information in terms of you

18   were having an affair with his daughter?

19          INMATE GUZMAN THROUGH INTERPRETER:  Well,

20   that is true.

21          PRESIDING COMMISSIONER MOORE:  Okay.

22          ATTORNEY SPOWART:  Wait a minute.  Would

23   you ask that -- because I asked him.  Would ask

24   that question again, Sir?

25          PRESIDING COMMISSIONER MOORE:  Sure.  I

26   asked you, did you have an affair with the victim's

27   daughter, you said yes.

13

1      INMATE GUZMAN THROUGH INTERPRETER:   Yes.
2   Yes, she did go to bed with me.   I said that in
3   court.
4      PRESIDING COMMISSIONER MOORE:   Yes, sir.
5   All right.   That's been part of the transcript.
6      ATTORNEY SPOWART:   I know, I --
7      PRESIDING COMMISSIONER MOORE:   Okay.   All
8   right.   I understand, Counsel.   Let's see -- Now,
9   so you don't remember why you and the victim got in
10   an argument in the first place?   You don't know why
11   that happened?
12      INMATE GUZMAN THROUGH INTERPRETER:   No,
13   Sir.   I don't remember ever arguing with him.
14      PRESIDING COMMISSIONER MOORE:   All right.
15   And so, what time did you start drinking that day,
16   do you remember?
17      INMATE GUZMAN THROUGH INTERPRETER:   That
18   day, well I had been drinking since (indiscernible)
19   or about the 19th.   I started drinking on
20   December 6th.
21      PRESIDING COMMISSIONER MOORE:   And you was
22   in a continuous stupor that whole time?
23      INMATE GUZMAN THROUGH INTERPRETER:   During
24   the day.   I didn't drink during the night.
25      PRESIDING COMMISSIONER MOORE:   All right,
26   Mr. Guzman.   Is there anything else about the
27   committing offense, your actions in the committing

14

1   offense that you'd like to share with us today?

2         INMATE GUZMAN THROUGH INTERPRETER:   No, I

3   wasn't aware of anything.   I mean, I would like to

4   know the truth, because that's something -- I mean,

5   just can't gather me how, I mean, can someone die

6   like that.

7         PRESIDING COMMISSIONER MOORE:  .Well, you --

8   there is an Appellate Decision, Mr. Guzman, and did

9   you get a copy of that? As well as there --

10         INMATE GUZMAN THROUGH INTERPRETER:   It's

11  back there.

12         PRESIDING COMMISSIONER MOORE:.  Okay.  As

13  well as your Probation Officer's Report has the

14  same information.   That's what took place.   You had

15  a court trial, and you were found guilty of doing

16  those things.   But you -- here today you told us

17  you don't remember.   So you had an --

18         INMATE GUZMAN THROUGH INTERPRETER:   That's

19  what (indiscernible) said, though.

20         PRESIDING COMMISSIONER MOORE:   I know, I

21  understand that.   And you had an alcohol problem

22  for some time.   How old were you --

23         INMATE GUZMAN THROUGH INTERPRETER:   Not

24  anymore.

25         PRESIDING COMMISSIONER MOORE:   No, how old

26  were you when you started drinking alcohol so

27  heavily?

15

1      INMATE GUZMAN THROUGH INTERPRETER:    I was

2  very young, 13, 14.

3      PRESIDING COMMISSIONER MOORE:    All right.

4  And you never tried to get any help for it, you

5  never tried to go to AA before?

6      INMATE GUZMAN THROUGH INTERPRETER:    I

7  attended a group sometime in Los Angeles.

8      PRESIDING COMMISSIONER MOORE:    Before the

9  murder?

10     INMATE GUZMAN THROUGH INTERPRETER:    Yes,

11  way before that.

12     PRESIDING COMMISSIONER MOORE:    How much

13  longer before it?

14     INMATE GUZMAN THROUGH INTERPRETER:    About

15  17 years.

16     PRESIDING COMMISSIONER MOORE:    All right.

17  And how long did you attend?

18     INMATE GUZMAN THROUGH INTERPRETER:    Five or

19  six weeks.

20     PRESIDING COMMISSIONER MOORE:    So you

21  didn't give yourself a chance.

22     INMATE GUZMAN THROUGH INTERPRETER:    I had

23  no time to continue going because of my job.

24     PRESIDING COMMISSIONER MOORE:    When you

25  have a problem like that, Mr. Guzman, you have to

26  make time, otherwise you won't have a job.

27     INMATE GUZMAN THROUGH INTERPRETER:    Yes,

16

1    but I've never had any trouble at work because of

2    my alcohol problem.

3          PRESIDING COMMISSIONER MOORE:   Yes, I know.

4    You had no juvenile problem, and the instant

5    offense is the only contact with law enforcement.

6          INMATE GUZMAN THROUGH INTERPRETER:   I mean,

7    now that I can't do anything any more.

8          PRESIDING COMMISSIONER MOORE:   But that

9    doesn't mean -- that doesn't mean that you didn't

10   have a problem.   That's, you know, my concern.   All

11   right.   Personal factors, you were born in 1930.

12          INMATE GUZMAN THROUGH INTERPRETER:

13   September 20th.

14          PRESIDING COMMISSIONER MOORE:   And let me

15   see -- your parents are Isabel Michael and Ron

16   Guzman.

17          INMATE GUZMAN THROUGH INTERPRETER:   Yes,

18   Sir.

19          PRESIDING COMMISSIONER MOORE:   And you have

20   13 brothers and sisters.

21          INMATE GUZMAN THROUGH INTERPRETER:

22   Thirteen or 14.

23          INMATE GUZMAN:   We are 14.

24          PRESIDING COMMISSIONER MOORE:   Big family.

25          INMATE GUZMAN:   We are 14.

26          PRESIDING COMMISSIONER MOORE:   How many of

27   your family is still alive today?

17

1      INMATE GUZMAN THROUGH INTERPRETER:  They
2  all do.

3      PRESIDING COMMISSIONER MOORE:  Wonderful,
4  you're blessed.  And what is your relationship with
5  your family today?  We got some letters, and I know
6  that some of them still live in Mexico.

7      INMATE GUZMAN THROUGH INTERPRETER:  The
8  good ones are the ones that help me.

9      PRESIDING COMMISSIONER MOORE:  The good
10  ones?  Wait a minute, just because they don't help
11  you don't mean they're not good ones.  But because
12  they help you, they're good ones?

13      INMATE GUZMAN THROUGH INTERPRETER:  I mean,
14  I realize that some family members of some inmates
15  here do not even remember them any more.

16      PRESIDING COMMISSIONER MOORE:  Yeah.  But
17  there's a reason for that.  They burned those
18  bridges.  They misused their family members, I
19  don't know how many times.  And after a period of
20  time, folks get tired of that.  They get tired of
21  getting burned, getting used and misused.

22      INMATE GUZMAN:  Sí.

23      PRESIDING COMMISSIONER MOORE:  Okay.  So I
24  understand that, but you're right.  Sometimes
25  people do forget.  And then there are other family
26  members that stick with folks forever, no matter
27  how many times they do wrong.  And you're blessed

18

1    that you have someone -- some people, some family.

2    Okay? All right. So let me see here -- It says

3    that you married Sophia Hernandez in 1960 and you

4    had six children.

5            INMATE GUZMAN THROUGH INTERPRETER:  Yes,

6    Sir.

7            PRESIDING COMMISSIONER MOORE:  And what is

8    the relationship with your family now?  Are you

9    still married?

10           INMATE GUZMAN THROUGH INTERPRETER:  Yes,

11   we're married.

12           PRESIDING COMMISSIONER MOORE:  Okay.  And

13   your children, so they -- you have a relationship

14   with them still?

15           INMATE GUZMAN THROUGH INTERPRETER:  Yes.

16           PRESIDING COMMISSIONER MOORE:  Okay.  They

17   write and they accept your calls?

18           INMATE GUZMAN THROUGH INTERPRETER:  I call

19   them on the telephone.

20           PRESIDING COMMISSIONER MOORE:  Okay, good.

21   It says you were prosecuted and deported to Mexico

22   in 1970, March -- or strike that, July the 30th.

23   You did not receive a formal education, and your

24   education consists of one year of kindergarten

25   level.  You worked as a cook and a laborer.

26           INMATE GUZMAN THROUGH INTERPRETER:  Yes.

27           PRESIDING COMMISSIONER MOORE:  Anything

19

1   else you want to tell us about your personal social

2   history before we go to post factors?

3           INMATE GUZMAN THROUGH INTERPRETER:   No.

4           PRESIDING COMMISSIONER MOORE:   All right,

5   Mr. Guzman.   Thank you, sir.   If you'll give your

6   attention to Commissioner Bachlor, she'll give you

7   a rendition of your post-conviction factors.

8           DEPUTY COMMISSIONER BACHLOR:   All right,

9   Mr. Guzman, we're going to talk about the period of

10  time that's elapsed since the last hearing, which

11  was September 25th, 2002.   At that time you were

12  denied parole for a period of one year.   You were

13  asked to remain disciplinary-free, to seek self-

14  help and therapy if available, and to upgrade

15  academically or educationally.   Correct?

16          INMATE GUZMAN THROUGH INTERPRETER:   Yes.

17          DEPUTY COMMISSIONER BACHLOR:   All right.

18  For the record, I'm showing a zero classification

19  score as of today.   It has not yet been adjusted

20  with the new classification system.   You achieved

21  that in June of 1999, and you remain Medium A

22  custody.   It appears that you have completed the

23  Adult Basic Education III course.   Is that correct?

24          INMATE GUZMAN THROUGH INTERPRETER:   Yes,

25  Ma'am.

26          DEPUTY COMMISSIONER BACHLOR:   Okay.   You

27  have not yet attained a GED?

20

1          INMATE GUZMAN THROUGH INTERPRETER:   No.

2          DEPUTY COMMISSIONER BACHLOR:   All right.

3    Have you attempted to take that test?

4          INMATE GUZMAN THROUGH INTERPRETER:   I'm

5    preparing for it.   I haven't taken it yet.

6          DEPUTY COMMISSIONER BACHLOR:   All right.

7    And it appears that as far as work assignments you

8    have no work assignments because of your continuing

9    involvement in education.

10         INMATE GUZMAN THROUGH INTERPRETER:

11   Education.

12         DEPUTY COMMISSIONER BACHLOR:   All right.   I

13   don't show that you have any vocational courses

14   completed during the last year, and I don't believe

15   you have any during your incarceration.   Is that

16   correct?

17         INMATE GUZMAN THROUGH INTERPRETER:   No.

18         DEPUTY COMMISSIONER BACHLOR:   As far as

19   self-help programs, I do have consistent chronos in

20   the file since the last hearing indicating

21   continued efforts with Alcoholics Anonymous,

22   Narcotics Anonymous.

23         INMATE GUZMAN THROUGH INTERPRETER:   Yes,

24   Ma'am.

25         DEPUTY COMMISSIONER BACHLOR:   Okay.   And

26   you're going pretty consistently, apparently.

27         INMATE GUZMAN THROUGH INTERPRETER:   Yes.

21

1      DEPUTY COMMISSIONER BACHLOR:  All right.  I

2  also have a certificate from the Plato Language

3  Arts, Levels A to J, dated September 27th, '02, two

4  days after the last hearing.  And also a

5  certificate for completion of Computer-Aided

6  Instruction.  So some of the education that you're

7  pursuing, you do that by yourself on the computer?

8      INMATE GUZMAN THROUGH INTERPRETER:  Yes.  I

9  have been with the computer for short periods of

10  time.  But the programs I've done, I've done on

11  them on my own.

12      DEPUTY COMMISSIONER BACHLOR:  All right.

13  Anything else regarding self-help that I have

14  missed?

15      INMATE GUZMAN THROUGH INTERPRETER:  No, I

16  don't think so, no.

17      DEPUTY COMMISSIONER BACHLOR:  All right.

18  And it does appear that you've been able to remain

19  disciplinary-free.  I'm showing absolutely no 128s

20  or 115s in your file since inception to prison.

21  And that's very commendable.  All right.  Is there

22  anything else we need to cover regarding academics,

23  your work, education, vocation, or self-help?

24      INMATE GUZMAN THROUGH INTERPRETER:  No, I

25  think everything's fine.

26      DEPUTY COMMISSIONER BACHLOR:  All right.

27  We'll go to your Board report then.  Did you have a

22

1    chance to read your Board report?

2         INMATE GUZMAN:  Sí.

3         DEPUTY COMMISSIONER BACHLOR:  Do you know

4    what the counselor said about you?

5         INMATE GUZMAN THROUGH INTERPRETER:  I have

6    it here with me.

7         DEPUTY COMMISSIONER BACHLOR:  All right.

8         INMATE GUZMAN THROUGH INTERPRETER:  I have

9    a copy of it.

10         DEPUTY COMMISSIONER BACHLOR:  All right.  I

11    have a Board report dated August 17th, 2003, by

12    Correctional Counselor I Harris, H-A-R-R-I-S.  In

13    that report he speaks about what you've been doing

14    during the last year, and he also writes a summary

15    regarding his impression of you.  Says:

16              "Considering the commitment offense,

17              prior record, and prison adjustment,

18              no CDC 115s or 128s since reception

19              into CDC, this writer believes

20              Guzman would pose a low degree of

21              threat to society if released from

22              prison at this time."

23    Do you agree with that assessment?

24         INMATE GUZMAN THROUGH INTERPRETER:  Yes.

25         DEPUTY COMMISSIONER BACHLOR:  All right.

26    Anything else we need to talk about regarding the

27    Board report?

23

1          INMATE GUZMAN THROUGH INTERPRETER:   I don't

2    think there's anything else.

3          DEPUTY COMMISSIONER BACHLOR:   Okay.   All

4    right.   We'll move on to the psychological report.

5    Have you had a chance to read that also?

6          INMATE GUZMAN THROUGH INTERPRETER:   Yes.

7          DEPUTY COMMISSIONER BACHLOR:   All right.

8    There is an updated report in the file dated

9    August 28th, 2003.   It's authored by E.W. Hucheck

10   -- Hewchuk, I guess.   It's H-E-W-C-H-U-K, PhD,

11   Staff Psychologist, co-signed by Zika, Z-I-K-A.   In

12   the report it indicates:

13          "Inmate Guzman does not fit the

14          stereotype of a habitual criminal.

15          Due to his advanced age and total

16          institutional compliance during

17          incarceration, he poses an extremely

18          low risk if released to the

19          community.   If he has openly

20          acknowledged his history of alcohol

21          abuse and poor judgment, and has

22          spent the past --"

23   It doesn't say, "if he has," it says, "he has

24   openly acknowledged."   All right.

25          "-- and has spent the past 15 years

26          actively working towards change.   He

27          has good insight into his prior

24

1          behavior and is fully remorseful for

2          his offense.  Due to the low risk

3          factors and close family support,

4          inmate Guzman is appropriate for

5          release with a negligible

6          probability of recidivism."

7     Now, the prior report from December 23rd, 1998,

8     does have a Diagnostic Impression.  Axis I, alcohol

9     abuse dependence in institutional remission.  It

10    also says adult antisocial behavior.  Axis II, no

11    personality disorder, and Axis V is showing a GAF

12    score of 85.  It was a positive prognosis for being

13    able to maintain in the community.  And that one

14    had you at significantly below average compared to

15    other level II population inmates, and it was

16    average relative to the average citizen in the

17    community.  However, it indicates that your

18    precursor to violence would be -- the problem would

19    be if you continued to drink alcohol when you were

20    released.  All right.  Is there anything else that

21    we need to cover regarding the psychological

22    reports?

23          INMATE GUZMAN THROUGH INTERPRETER:  No.

24          DEPUTY COMMISSIONER BACHLOR:  All right.

25    We'll move on to parole plans then.  And as

26    indicated to the District Attorney a little

27    earlier, we do have only one current letter in

25

```
1    file, and it's from your niece, Maria H. Natividad,

2    N-A-T-I-V-I-D-A-D.  It is dated September 8, 2003.

3    And she indicates that she will provide financial

4    and emotional support for you, and she cares about

5    you very much.  Apparently you were there for her

6    when she lost her father and she wants to repay

7    you.  She's asking us to show compassion.  Now, she

8    lives in Covina, California.

9          INMATE GUZMAN THROUGH INTERPRETER:  Yes.

10          DEPUTY COMMISSIONER BACHLOR:  All right.

11   So if she's going to provide emotional support, it

12   would have to be by telephone, letter, or her

13   traveling to see you in Mexico.  Is that correct?

14          INMATE GUZMAN THROUGH INTERPRETER:  Yes.

15          DEPUTY COMMISSIONER BACHLOR:  All right.

16   You do understand you have an INS hold.

17          INMATE GUZMAN THROUGH INTERPRETER:  Yes.

18          DEPUTY COMMISSIONER BACHLOR:  Your wife

19   also plans to move to Mexico?

20          INMATE GUZMAN THROUGH INTERPRETER:  If I'm

21   released, yes.

22          DEPUTY COMMISSIONER BACHLOR:  All right.

23   What about the children, four sons and two

24   daughters, I believe.

25          INMATE GUZMAN THROUGH INTERPRETER:  Well,

26   they live separately now.  They have their own

27   families.
```

26

1    DEPUTY COMMISSIONER BACHLOR:  So they would
2    stay here in California and visit you?
3        INMATE GUZMAN THROUGH INTERPRETER:  Yes.
4    Well, they were born over there, but they were
5    raised here.  This is where they went to school.
6        DEPUTY COMMISSIONER BACHLOR:  Have they
7    been visiting you here?
8        INMATE GUZMAN THROUGH INTERPRETER:  Yes.
9        DEPUTY COMMISSIONER BACHLOR:  How often?
10       INMATE GUZMAN THROUGH INTERPRETER:  Not
11    that often.  They live far away.
12       DEPUTY COMMISSIONER BACHLOR:  All right.
13    Do you maintain contact through letters though?
14       INMATE GUZMAN THROUGH INTERPRETER:  Yes.
15       DEPUTY COMMISSIONER BACHLOR:  All right.
16    We have several letters in file from -- they're
17    dated 2002.  There's a note in here from, I
18    believe, the counselor, indicating that the letters
19    are to be considered for the 2003 hearing.  They
20    were not received prior to the 2002 hearing.  I'm
21    going to go through those briefly.  September 8,
22    2002, from Marines Guzman, M-A-R-I-N-E-S
23    G-U-Z-M-A-N, and she says she's writing on behalf
24    of you and you are her uncle.  Is that right?
25       INMATE GUZMAN THROUGH INTERPRETER:  Yes.
26       DEPUTY COMMISSIONER BACHLOR:  All right.
27    And she is offering, I think, just general support,

27

1    it appears.  She's in Los Angeles.  Correct?

2                INMATE GUZMAN THROUGH INTERPRETER:  Yes.

3                DEPUTY COMMISSIONER BACHLOR:  All right.  I

4    have another letter from Iris Romero, R-O-M-E-R-O,

5    also living in Los Angeles.

6                INMATE GUZMAN THROUGH INTERPRETER:  Yes.

7                DEPUTY COMMISSIONER BACHLOR:  And she is a

8    friend and met you for -- prior to incarceration.

9                INMATE GUZMAN THROUGH INTERPRETER:  Yes.

10               DEPUTY COMMISSIONER BACHLOR:  All right.

11   Has she been writing to you during your

12   incarceration?

13               INMATE GUZMAN THROUGH INTERPRETER:  I also

14   call that family on the telephone.

15               DEPUTY COMMISSIONER BACHLOR:  All right.

16   So you're -- it's a member of the family that

17   you're associated with.

18               INMATE GUZMAN THROUGH INTERPRETER:  Yes,

19   they were friends of the family.

20               DEPUTY COMMISSIONER BACHLOR:  All right.

21   And this is indicating that she's willing to help

22   you and give you a room and board upon your

23   release; however, I believe she's referring to Los

24   Angeles.  Is that correct?

25               INMATE GUZMAN THROUGH INTERPRETER:  Yes,

26   she lives in Los Angeles.

27               DEPUTY COMMISSIONER BACHLOR:  All right.  I

28

1    have another letter from Ophelia Romero, one of the

2    other family members.

3            INMATE GUZMAN THROUGH INTERPRETER:  Yes.

4            DEPUTY COMMISSIONER BACHLOR:  Okay.  And

5    Ophelia also lives in Los Angeles.

6            INMATE GUZMAN THROUGH INTERPRETER:  Yes.

7            DEPUTY COMMISSIONER BACHLOR:  She would

8    provide housing and shelter if you were released to

9    Los Angeles.  Letter from -- I'm having trouble

10   pronouncing this one -- it looks like Commiserato

11   Udall (phonetic).

12           INMATE GUZMAN THROUGH INTERPRETER:  He's a

13   representative of the village where I'm going in

14   Mexico.

15           DEPUTY COMMISSIONER BACHLOR:  Okay.  All

16   right.  And it says here that the community knows

17   you, you were born there, a member of the

18   community, and your father is deceased, your mother

19   is still there in the community, and --

20           INMATE GUZMAN THROUGH INTERPRETER:

21   Actually, she also passed away.

22           DEPUTY COMMISSIONER BACHLOR:  Your mother

23   passed away?  I'm sorry to hear about that.  When

24   was that?

25           INMATE GUZMAN THROUGH INTERPRETER:  In May.

26           DEPUTY COMMISSIONER BACHLOR:  Okay.

27   Because we have a letter from her, Isabel, is that

29

1   right?

2            INMATE GUZMAN THROUGH INTERPRETER:   Yes.

3            DEPUTY COMMISSIONER BACHLOR:  All right.

4   Now, you have brothers and sisters, however, still

5   in Mexico.  Is that correct?

6            INMATE GUZMAN:  Sí.

7            DEPUTY COMMISSIONER BACHLOR:  Maybe we'll

8   get to those letters here.  All right.  And it says

9   the community welcomes you back to where you were

10  born.  We already covered Maria Natividad, I

11  believe.  Also Guzman?

12           INMATE GUZMAN THROUGH INTERPRETER:  What

13  was the name?

14           DEPUTY COMMISSIONER BACHLOR:  An Elsa,

15  E-L-S-A?

16           INMATE GUZMAN THROUGH INTERPRETER:  She's

17  my daughter.

18           DEPUTY COMMISSIONER BACHLOR:  Your

19  daughter, all right.  And where does she live?

20           INMATE GUZMAN THROUGH INTERPRETER:  In San

21  Diego.

22           DEPUTY COMMISSIONER BACHLOR:  It looks like

23  Imperial Beach, California.  All right.  Says that

24  you're currently seeking immigration benefits.  She

25  would provide housing to you.

26           INMATE GUZMAN THROUGH INTERPRETER:  She

27  wants me to stay here.

30

1          DEPUTY COMMISSIONER BACHLOR:    Right.    She

2    said she'd provide housing to you if you're

3    released to California.    All right.    We have a

4    letter from Matias (phonetic) Gomez Pena --

5          INMATE GUZMAN:    Mi amigo.

6          DEPUTY COMMISSIONER BACHLOR:    -- Azusa,

7    California.    All right.    So general support again

8    and assist you financially.    Anna Bertha Gomez.

9          INMATE GUZMAN THROUGH INTERPRETER:    She's

10   Matias' wife.

11         DEPUTY COMMISSIONER BACHLOR:    And this was

12   -- all right.    I'm going to go through here and see

13   -- Do we have any letters here from Mexico?

14         INMATE GUZMAN THROUGH INTERPRETER:    The one

15   from my mother and the one from that was

16   (indiscernible).

17         DEPUTY COMMISSIONER BACHLOR:    The

18   community.    None from the brothers and sisters?

19         INMATE GUZMAN THROUGH INTERPRETER:    Not

20   from the ones that are in Mexico, no.

21         DEPUTY COMMISSIONER BACHLOR:    All right.

22   Some of these are in Spanish.

23         INMATE GUZMAN THROUGH INTERPRETER:    Yes.

24         DEPUTY COMMISSIONER BACHLOR:    All right.

25   What are your plans if you are released to Mexico?

26   Who are you going to live with at this point?

27         INMATE GUZMAN THROUGH INTERPRETER:    With my

31

1    wife at one of my mother's houses.

2        DEPUTY COMMISSIONER BACHLOR:  All right.

3    And employment or -- you're 73 years old.

4        INMATE GUZMAN THROUGH INTERPRETER:  Maybe a

5    small business, I mean, taking into account my age.

6        DEPUTY COMMISSIONER BACHLOR:  All right.

7    And someone indicated they'd help set you up with a

8    business in Mexico.  Now, what else do you plan to

9    do if you're released to Mexico?  What would your

10   day consist of?

11       INMATE GUZMAN THROUGH INTERPRETER:  We can

12   probably organize an Alcoholics Anonymous programs

13   down there because there's a lot of rottenness

14   regarding that.

15       DEPUTY COMMISSIONER BACHLOR:  In other

16   words, there's a lot of people that have some

17   drinking problems that you'd want to help with?

18       INMATE GUZMAN THROUGH INTERPRETER:  Yes.

19   Hopefully I could do something; maybe it's too big.

20       DEPUTY COMMISSIONER BACHLOR:  Do you

21   believe you've learned enough here from the program

22   to be able to organize a program there?

23       INMATE GUZMAN THROUGH INTERPRETER:  I can

24   also take (indiscernible).  There are people who

25   are more qualified than I am.

26       DEPUTY COMMISSIONER BACHLOR:  Okay.  Are

27   you practicing the 12 steps today?

32

1    INMATE GUZMAN THROUGH INTERPRETER:  I know

2    the 12 steps in Spanish.

3    DEPUTY COMMISSIONER BACHLOR:  Okay.  And

4    step four would be what?

5    INMATE GUZMAN THROUGH INTERPRETER:  Without

6    fear we made a meticulous inventory of ourselves --

7    a moral inventory of ourselves.

8    DEPUTY COMMISSIONER BACHLOR:  All right.

9    And have you done that?

10    INMATE GUZMAN THROUGH INTERPRETER:  More or

11    less.  I believe so.  I have to be doing it

12    continuously, there's a lot of people I offended

13    with this, entire society, the society in general.

14    They're the ones that are bearing my expenses.

15    DEPUTY COMMISSIONER BACHLOR:  All right.

16    And how have you made amends to the victim's

17    family?

18    INMATE GUZMAN THROUGH INTERPRETER:  I have

19    no relationship with them.  I think they might be

20    offended if I were allowed to write to them.

21    DEPUTY COMMISSIONER BACHLOR:  All right.

22    Anything else regarding parole plans?

23    INMATE GUZMAN THROUGH INTERPRETER:  No.

24    DEPUTY COMMISSIONER BACHLOR:  All right.

25    INMATE GUZMAN THROUGH INTERPRETER:  I have

26    lots of support, enough support.  I have a lot of

27    support.

33

1          DEPUTY COMMISSIONER BACHLOR:  All right.

2    We sent out 3042 notices to various parties that

3    are interested in your parole hearing today.  We

4    received no written responses from any of those.

5    However, we do have a member of the District

6    Attorney's office here today that will make their

7    statement at the appropriate time regarding your

8    parole suitability.  And I'll return it back to

9    Commissioner Moore.

10          PRESIDING COMMISSIONER MOORE:  Questions?

11          DEPUTY COMMISSIONER BACHLOR:  Not from me,

12    thank you.

13          PRESIDING COMMISSIONER MOORE:  Okay.

14    Ms. Pott, questions?

15          DEPUTY DISTRICT ATTORNEY POTT:  Yes.  How

16    has the inmate made amends to his wife, who he was

17    cheating on?

18          PRESIDING COMMISSIONER MOORE:  Do you

19    understand the question, Mr. Guzman?

20          INMATE GUZMAN THROUGH INTERPRETER:  We

21    haven't talked about that at all.

22          PRESIDING COMMISSIONER MOORE:  Has your

23    wife forgiven you for that?

24          INMATE GUZMAN THROUGH INTERPRETER:  We

25    haven't touched on the subject.

26          PRESIDING COMMISSIONER MOORE:  You've never

27    talked about it.  Is she aware of it?

34

1          INMATE GUZMAN THROUGH INTERPRETER:  I would

2    imagine.  She was attending the court hearings, she

3    might have heard.

4          PRESIDING COMMISSIONER MOORE:  And she

5    never talked to you about it in all these years?

6          INMATE GUZMAN THROUGH INTERPRETER:  No,

7    she's never told me anything.

8          PRESIDING COMMISSIONER MOORE:  Proceed,

9    Counsel.

10          DEPUTY DISTRICT ATTORNEY POTT:  If the

11    inmate returns home to the wife and she later finds

12    out, what are his plans for residence at that time?

13          INMATE GUZMAN THROUGH INTERPRETER:  Well, I

14    would accept her decision, whatever she decides.

15          DEPUTY DISTRICT ATTORNEY POTT:  So where

16    would the inmate move?

17          INMATE GUZMAN THROUGH INTERPRETER:  In

18    Mexico.

19          DEPUTY DISTRICT ATTORNEY POTT:  I have no

20    further questions.

21          PRESIDING COMMISSIONER MOORE:  Mr. Spowart?

22          ATTORNEY SPOWART:  Yes.  Was the victim

23    your friend?

24          INMATE GUZMAN THROUGH INTERPRETER:  Yes.

25          ATTORNEY SPOWART:  In fact, when I asked

26    you about the victim, you told me he was your best

27    friend.  Is that right?

35

1       INMATE GUZMAN THROUGH INTERPRETER:    The

2  best friend that I have.

3       ATTORNEY SPOWART:    I asked you about a

4  vocation and you told me that because of your age

5  they wouldn't let you get into a vocation.    Is that

6  right?

7       INMATE GUZMAN THROUGH INTERPRETER:    When I

8  went to my initial hearing, they told me that

9  because of my age they wouldn't recommend it.

10      ATTORNEY SPOWART:    So you're still in

11  academics.

12      INMATE GUZMAN THROUGH INTERPRETER:    Yes.

13      ATTORNEY SPOWART:    Okay.    And you've been

14  getting good grades.

15      INMATE GUZMAN THROUGH INTERPRETER:    I'm

16  trying to see if I can get my GED.

17      ATTORNEY SPOWART:    Okay.    And I believe you

18  told the Commissioner that you know all the 12

19  steps in Spanish, correct?

20      INMATE GUZMAN THROUGH INTERPRETER:    In

21  Spanish, yes.

22      ATTORNEY SPOWART:    Okay.    I haven't --

23      PRESIDING COMMISSIONER MOORE:    Mr. Guzman,

24  step eight and step nine.

25      INMATE GUZMAN THROUGH INTERPRETER:    Eight,

26  we made a list of all those people we have offended

27  and were willing to repair the damage that we

36

1    caused.  Nine, we directly repaired, when it was

2    possible to repair the damage, unless if we

3    repaired it, it would cause harm to them or to

4    others.

5         PRESIDING COMMISSIONER MOORE:  Okay.  So

6    have you made that list?

7         INMATE GUZMAN THROUGH INTERPRETER:  It

8    would be endless.

9         PRESIDING COMMISSIONER MOORE:  It would be

10   endless.  I didn't ask you if it was endless.  Have

11   you made the list?

12        INMATE GUZMAN THROUGH INTERPRETER:  I mean,

13   it would be endless.  I couldn't finish.  I mean,

14   some people -- I mean, a lot of people were

15   offended, direct or indirect.

16        PRESIDING COMMISSIONER MOORE:  Okay.  For

17   this list, Mr. Guzman, who is one, two, and three

18   on this list?

19        INMATE GUZMAN THROUGH INTERPRETER:  The

20   victim's family.

21        PRESIDING COMMISSIONER MOORE:  The victim's

22   family, all right.

23        INMATE GUZMAN THROUGH INTERPRETER:  The

24   American society, mainly the People of the State of

25   California.  And third place, my family.

26        PRESIDING COMMISSIONER MOORE:  All right.

27   Thank you.  Closing.

37

1          DEPUTY DISTRICT ATTORNEY POTT:    In this

2     matter, the offense was carried out in an

3     especially heinous, atrocious, cruel, and callous

4     manner.   The inmate in this matter did, in fact,

5     injure three different people.   One, his best

6     friend, second or -- second, he attempted to shoot

7     at the wife of his best friend, Bertha Garcia, and

8     then also, apparently, attempted to shoot at Pablo

9     Garcia.  However, the gun jammed, I guess, on some

10    of those two occasions.   It was carried out in a

11    manner that exhibited a callous disregard for the

12    life or suffering of another.   In fact, the inmate

13    even apparently told Mia Sola (phonetic) that he

14    wanted to make her suffer, wanted to make her hurt,

15    where it would hurt her the most.   The offense was

16    carried out in a dispassionate and calculated

17    manner.   Again, this was the -- this was the family

18    that was closest to him.   There were multiple

19    victims, and the murder of the victim, Pasquale

20    Garcia, did not deter the inmate from later

21    committing the offenses against Bertha Garcia and

22    Pablo Garcia, which occurred on the same -- on the

23    same occasion.   In this matter the inmate also has

24    unrealistic parole plans and he has a lack of

25    insight into his actions on this date.   Certainly

26    the -- his mental status, whether it -- whether it

27    be -- although he says that he blacked out for a

38

1    number of hours, certainly his mental status had to

2    have been something that was going on for much

3    longer than just a couple hours. These were people

4    who were close to him, he knew them for quite a

5    while, it happened on Christmas day, these were the

6    people he was having Christmas with, and he

7    specifically made statements that he wanted to make

8    them suffer, went back, got the gun -- got the

9    rifle, and came back and shot at them. Certainly

10   it seems that it's the feeling, the passion, the --

11        [Thereupon, the tape was turned over.]

12        DEPUTY COMMISSIONER BACHLOR:  We're on

13   record, side two.

14        DEPUTY DISTRICT ATTORNEY POTT:  Coupled in

15   with the unrealistic parole plans, it appears that

16   there is not -- there are not any real plans for

17   continuing alcohol abuse treatment, AA meetings,

18   something along those -- along those lines to

19   maintain his sobriety and to help ensure that

20   something like this will not happen in the future.

21   In light of all that, it certainly seems that

22   without further insight, which the inmate certainly

23   did not show at the last parole hearing, is not

24   showing it this time, it seems appropriate to deny

25   parole to the inmate at this time, and for a

26   minimum of two years. He is going to need to get

27   some insight into why this happened, what happened,

39

1   and how he can prevent it in the future.

2   Submitted.

3       PRESIDING COMMISSIONER MOORE:  Thank you,

4   ma'am, thank you for your comments.  Mr. Spowart?

5       ATTORNEY SPOWART:  Yeah.  This man was

6   convicted at a court trial of murder second degree,

7   not murder first.  It wasn't premeditated.  Murder

8   second degree.  And it's easy to see why he was

9   convicted of murder second, you know.  He was

10  obviously under the influence of alcohol.  His mind

11  was -- this was his best friend, best friend.  He'd

12  known this man for years.  It was an involved set

13  of circumstances and he got involved with this

14  woman.  It was an emotional thing, acting on the

15  spur of the moment.  He had no (indiscernible).

16  He's a hard-working guy all his life.  Married, had

17  six children, no formal education, worked as cook

18  and laborer.  Signs of remorse, yes.  If you look

19  at the psych reports they state that he's able to

20  articulate his remorse.  Again, it was his best

21  friend, you know.  Motivation, basically alcohol,

22  (indiscernible) of alcohol.  Adult crime, the

23  instant offense only.  So we're not looking at a

24  career criminal, we're not looking at somebody that

25  is preying on society, we're not looking at

26  somebody that if you let him out tomorrow he's

27  going to go out and hit somebody over the head.

40

1    This was a unique set of circumstances.  And when I

2    get to the psych report, it's clear, but the psych

3    (inaudible).  He was 58 then, he's 73 now, 73.

4    He's an old -- he's not going to get out and be

5    working.  He's going -- he'll probably do some kind

6    of work but he's limited in what he can do.  His

7    parole plans, not according to what the DA -- well,

8    I realize she didn't get a chance to look at this

9    -- letters, but she really has a -- amazing set of

10   (indiscernible), and the thing that gets me is you

11   look at the warmth of these letters, how warm they

12   feel towards this man.  Just read those letters.

13   Maybe if she had a chance to read them, she'd

14   understand how much feeling his family has for this

15   man.  He did a terrible thing.  Nobody's going to

16   excuse him.  He's been -- and he's been paying for

17   it.  But he has good family support.  He wants to

18   go back to Mexico.  We (inaudible) and he knows

19   that.  Institutional adjustment, excellent.  He's

20   been disciplinary-free his entire period of

21   incarceration, which goes along with the fact that

22   he had no juvenile record, which goes along with

23   the fact that he had no adult record except for the

24   instant offense.  The Board report is low, the

25   psych report is very good.  And he's trying hard to

26   upgrade educationally.  And I'd just like to go

27   back to the psych report.  I know the Commissioner

41

1    read it, but I'd like to read it again.

2            "He has maintained full

3            institutional compliance and there's

4            no evidence of any disciplinary

5            actions throughout his entire

6            incarceration.  Inmate Guzman has

7            been attending Alcoholics Anonymous

8            programming regularly for the past

9            15 years and has showed clear

10           evidence of motivation to remain

11           sober."

12   He knows all the 15 [sic] steps, he does.  He's

13   been in there and you could ask him anything.  He

14   knows them.  He understands that he was an

15   alcoholic.  I think if anything should

16   (indiscernible) that's clear.  "Inmate Guzman does

17   not fit the stereotype of a habitual criminal."

18   Again, that is clear, he (inaudible).

19            "Due to his advanced age and total

20           institutional compliance during

21           incarceration, he poses an extremely

22           low risk if released to the

23           community.  He has openly

24           acknowledged his history of alcohol

25           abuse and poor judgment, and spent

26           the past 15 years actually working

27           towards change.  He has good insight

42

1          into his prior behavior and is fully

2          remorseful for his offense. Due to

3          low risk factors and close family

4          support, inmate Guzman is

5          appropriate for release with a

6          negligible probability of

7          recidivism."

8    I don't (indiscernible). He's been in here before,

9    he can do it. He wants to go back, you know. He

10   has excellent support there. This was a set of

11   unusual circumstances, brought about by alcohol.

12   To understand how this man feels, again I'll go

13   back. The victim was his best friend. It was a

14   crazy situation and he has paid for the crime. I'd

15   ask the Board to find him suitable --

16          PRESIDING COMMISSIONER MOORE: Mr. Guzman,

17   are you okay? Excuse me, Counsel. Are you okay?

18          DEPUTY COMMISSIONER BACHLOR: He needs some

19   water if possible.

20          PRESIDING COMMISSIONER MOORE:

21   (Indiscernible) water, please.

22          INTERPRETER ZAVALA: (Indiscernible) and a

23   cold.

24          PRESIDING COMMISSIONER MOORE: We're

25   getting him some water there. Mr. Guzman, hold on.

26   All right, Counsel, proceed.

27          ATTORNEY SPOWART: Because of his lack of

43

1    prior criminal history, because of his parole

2    plans, because of the people, the Board report, and

3    the psych report, very positive, completely

4    disciplinary-free, I would ask a finding of

5    suitability be made today. And I'll submit it.

6            PRESIDING COMMISSIONER MOORE:  Thank you,

7    Counsel. Mr. Guzman, it's your opportunity to make

8    a statement now if you'd like, or you can rest on

9    what Counsel has already said.

10           INMATE GUZMAN THROUGH INTERPRETER:  That's

11   fine.

12           PRESIDING COMMISSIONER MOORE:  We'll

13   recess, Mr. Guzman, and let you know our decision.

14           ATTORNEY SPOWART:  Excuse me.

15                      R E C E S S

16                      --o0o--

17

18

19

20

21

22

23

24

25

26

27

Board of Prison Terms

State of California

# Memorandum

Date: _11-25-03_

To: Prisoner Central File—Transcript
_Jose Guzman_            Life Prisoner Name,
_E - 53800_              CDC #

Subject: **REVIEW OF HEARING TRANSCRIPT**

I have reviewed the hearing transcript concerning a hearing that occurred on

_Nov 4, 2003_ [date] at _CTF - Soledad_ [location].

The following is a description of the discrepancies found during the review of the hearing transcript:

_Pg 1, Line 18 should read "245(A)(1)"_
_Pg 1, Line 26 should read "245(A)(1)"_
_Pg 1, Line 21 -    "     "   "245(A)(1)"_

_____ [Name of the Deputy Commissioner Transcript Reviewer]

_____ [Title]

[Rev. 12/2002]

44

1        CALIFORNIA BOARD OF PRISON TERMS

2               D E C I S I O N

3        DEPUTY COMMISSIONER BACHLOR:   We're back on

4   record.

5        PRESIDING COMMISSIONER MOORE:   Thank you.

6   Let the record show that all interested parties

7   have returned to the room.  Jose Guzman, CDC number

8   E- as in Edward 53800.  This Panel's reviewed all

9   information received from the public and relied on

10  the following circumstances in concluding that the

11  prisoner is not suitable for parole and would pose

12  an unreasonable risk of danger to society or a

13  threat to public safety if released from prison at

14  this time.  Mr. Guzman, the paramount reasoning

15  would be the timing and the gravity of the

16  committing offense.  The offense was carried out in

17  a vicious and brutal manner.  As well, let me say

18  this, Mr. Guzman, this will be another one-year

19  denial.  This is a real convoluted situation that

20  you were involved in.  Your wife and son had gone

21  to Mexico for the holiday.  You were left in the

22  care of the victim's daughter, Maricela (phonetic)

23  Garcia, who had just given birth to your grandson,

24  and the child of your son.  And you were visiting

25  the family on Christmas day and you -- there were

26  indications and you mentioned that you had been

27  JOSE GUZMAN    E-53800    DECISION PAGE 1   11/4/03

45

1    drinking for days, days on end.  There were

2    multiple victims attacked, injured, killed in this

3    incident, as Mr. Garcia, your best friend, lost his

4    life in this whole fiasco.  As well, the record

5    shows that you were in love with Maricela and at

6    some point during that evening she had told you she

7    was going to marry somebody else.  The offense was

8    carried out in a manner which demonstrates an

9    exceptionally insensitive disregard for human

10   sufferings.  You were angry.  The motive for this

11   crime was inexplicable and very trivial in

12   relationship to the offense, because this was about

13   anger, rejection, a machismo -- being under the

14   influence of alcohol.  You left the residence, you

15   retrieved a rifle, and you returned and confronted

16   this young lady, Maricela, and her father

17   confronted you, and you subsequently shot him.  As

18   well, if this wasn't bad enough, then you -- the

19   murder of the victim did not deter you, because

20   then you subsequently shot at two other victims,

21   Bertha and Pablo Garcia.  These conclusions are

22   drawn from the Statement of Facts wherein the

23   prisoner caused the demise of Pasquale Garcia and

24   attempted a shooting -- two other individuals in

25   this family, who was your friends, who were your

26   friends, who you were celebrating with.  It's

27   JOSE GUZMAN    E-53800    DECISION PAGE 2    11/4/03

46

1    frustrating and it's very confusing, Mr. Guzman.

2    Previous record, you had a history of -- an

3    unstable history of tumultuous relationships with

4    others commencing at an early age, around 13 or so,

5    developing a problem with substance abuse of

6    alcohol, as well as a prior criminal history of

7    entering the United States illegally and being

8    deported back in 1970. Institutionally you have

9    been programming very well. No 115s in your

10   entirety, you have no 128s at all. You're doing a

11   positive program in that regard, trying to make

12   development and changes in your educational

13   abilities, just haven't achieved a GED at this

14   time. You have upgraded -- trying to upgrade

15   educationally. I think your score, your TABE, was

16   like 10 point oh or nine point oh totally.

17   However, you have not sufficiently participated in

18   beneficial self-help therapy programming at this

19   time to better understand the causative factors in

20   this particular instance, this particular crime.

21   Psychosocial report was adequate. Parole plans

22   were questionable for us, at least for me anyway,

23   in terms of you have a US INS hold. There was a

24   letter from before, but at this point your mother

25   is deceased. There are no letters from folks in

26   Mexico that will determine or help to clarify your

27   JOSE GUZMAN    E-53800    DECISION PAGE 3    11/4/03

47

 1    existence in Mexico, being that you don't really

 2    have a vocational trade, being that you are in the

 3    70s now.  So I need some more clarification on how

 4    and who and where -- were properties left to you in

 5    that regard, that your mother lived in.  3042

 6    notices, opposition to release at this time would

 7    be the District Attorney's office of Los Angeles

 8    County, present today in opposition to a finding of

 9    suitability.  Remarks -- The Panel makes the

10    following findings, that the prisoner still needs

11    some self-help and therapy in order to face,

12    discuss, understand, and cope with stress in a

13    nondestructive manner, as I mentioned, to better

14    understand the causative factors, Mr. Guzman.  As I

15    mentioned earlier, this is -- the situation, how

16    you got yourself in the middle of this, how you got

17    so angry, so frustrated, your machismo, your

18    jealousy that allowed you to take the life of your

19    friend.  And until progress is made, the prisoner

20    continues to be unpredictable and a threat to

21    others.  As I said, this is a one-year -- another

22    one-year denial.  Recommendations are to continue

23    to remain disciplinary-free, which is not a

24    problem, it doesn't appear to be, has never been

25    for you in that regard.  But educationally, to go

26    ahead and complete that GED at this time, whatever

27    JOSE GUZMAN    E-53800   DECISION PAGE 4    11/4/03

48

1    the time is available for you to do so.   And if

2    it's available to you, Mr. Guzman, continue to

3    participate in self-help therapy, whatever may be

4    available, to understand these causative factors,

5    as I've mentioned earlier.   This will conclude the

6    reading of our decision today.   Commissioner, any

7    comments to the prisoner?

8              DEPUTY COMMISSIONER BACHLOR:   Mr. Moore --

9              PRESIDING COMMISSIONER MOORE:

10   (Indiscernible).

11             DEPUTY COMMISSIONER BACHLOR:   Sir,

12   Mr. Guzman, do you understand what the

13   Commissioner's telling you about parole plans?

14             INMATE GUZMAN THROUGH INTERPRETER:   Yes.

15             DEPUTY COMMISSIONER BACHLOR:   Okay.   We

16   need to know that you have an actual residence and

17   support in Mexico.   All right?   Otherwise, in my

18   opinion today, you come back with a GED next time,

19   if I were a Panel member, you are very close to a

20   parole date, for me today.   But we have to know

21   where you're going.   All right?   And you do need to

22   give some more thought as to what caused you to

23   commit this crime.   All right?   You're doing very

24   well.   Good luck, sir.

25             PRESIDING COMMISSIONER MOORE:   Mr. Guzman,

26   you're on the right track, you're doing the right

27   JOSE GUZMAN    E-53800    DECISION PAGE 5    11/4/03

49

1    kinds of things, just -- I understand it's

2    difficult -- this was a difficult crime that took

3    place and it's difficult for you to come to grips

4    with it, to be able to confront.  I understand

5    that.  Okay?  But at some point you're going to

6    have to -- need to try to make amends and come to

7    grips or come to terms with what you did.  This

8    will conclude the reading of our decision,

9    Mr. Guzman.  The time is 1020 hours.  Good luck to

10   you, sir.  Stay on the right track.

11        INMATE GUZMAN:  Okay, thank you.  Have a

12   nice day and a good one.

13        PRESIDING COMMISSIONER MOORE:  Good luck to

14   you, Mr. Guzman.

15        INMATE GUZMAN:  Thank you.

16                    --o0o--

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   FINAL DATE OF DECISION _____

27   JOSE GUZMAN    E-53800    DECISION PAGE 6    11/4/03

50

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CAROL A. EDWARDS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 49, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE GUZMAN, CDC No. E-53800, on NOVEMBER 4, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated November 16, 2003, at Sacramento County, California.

*Carol Edwards*
Carol A. Edwards
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT C
## (DECISION OF SEP. 25, 2002 HEARING)

39

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    DEPUTY COMMISSIONER LEHMAN:    Back on the

4    record.

5    PRESIDING COMMISSIONER MUNOZ:    All

6    right, thank you.  It's 11:15 a.m. and the

7    parole consideration hearing for inmate Jose

8    Guzman has resumed with all parties having

9    returned to the Hearing Room.  And Mr. Guzman,

10   this Panel reviewed all information received

11   from the public and relied on the following

12   circumstances in concluding that you are not

13   suitable for parole.  And that you would pose

14   an unreasonable risk of danger to society if

15   released from prison at this time.  Many

16   factors were considered.  First and foremost

17   was the commitment offense and its nature.  The

18   offense -- the offenses, I should say, were

19   carried out in a cruel manner, with a callous

20   disregard for human suffering.  Multiple

21   victims were attacked during the commission of

22   these -- of these crimes.  And, of course,

23   Mr. Garcia was killed.  And the motive for this

24   crime was inexplicable and/or very trivial in

25   relation to the offense.  These conclusions are

26   drawn from the Statement of Fact, where the

27   **JOSE GUZMAN   E-53800   DECISION PAGE 1   9/25/02**

40

1    inmate was involved in a very confusing or

2    complex situation.  According to the reports

3    we've read, his wife and his son had left for

4    Mexico and he was left in the care of the

5    victim's daughter, Maricela Garcia, who had

6    given birth to his grandson, or the child of

7    his son.  He was visiting that family on

8    Christmas Day.  He indicated during the hearing

9    that he had been drinking for a couple of days

10   and was drinking and continued drinking during

11   the dinner.  Our reports indicate that

12   Mr. Guzman was in love with Maricela Garcia and

13   at one point during the evening, she told him

14   she was going to marry somebody else.

15   Apparently this angered the inmate, although he

16   has -- he claims he has no recollection of what

17   occurred thereafter.  He apparently left the

18   residence and retrieved a rifle, returned, had

19   a confrontation with the young lady's father

20   and subsequently shot him.  And threatened

21   other people that responded to that incident.

22   The victim died from his wounds.  The inmate

23   remained at the scene for the arrival of police

24   and was subsequently arrested.  And as far as

25   the inmate's -- well, excuse me, I should say,

26   the inmate does have an unstable social history

27   **JOSE GUZMAN   E-53800   DECISION PAGE 2   9/25/02**

41

1    and prior criminality.  The social history

2    includes the use and abuse of alcohol.  The

3    relationship I tried my best to describe that

4    I mentioned earlier, and also, the fact that

5    initially he was an illegal immigrant, entering

6    into this country illegally from Mexico.)  He

7    was on legal status at the time of the

8    commitment offense.  The -- as far as the

9    inmate's institutional behavior, although he

10   has never completed a vocation or obtained a

11   GED, he has progressed well.  Educationally,

12   he has stayed in education for the most part.

13   He has come a long way in learning English.

14   And he has not received any disciplinary

15   citations --

16                    [Thereupon, the tapes

17                     were turned over.]

18            DEPUTY COMMISSIONER LEHMAN:  Okay.

19   We're back on the record.

20            PRESIDING COMMISSIONER MUNOZ:  He has

21   not received a 115 or 128(a) while

22   incarcerated.  The most recent psychological

23   evaluation is not totally supportive of

24   release.  And that report, authored by

25   Dr. Terrini, and dated 12/18/98, indicates as

26   read by Mr. Lehman that:

27   JOSE GUZMAN  E-53800  DECISION PAGE 3  9/25/02

42

1    "If released to the community, his

2    violence potential is estimated to

3    be roughly average, relative to

4    the average citizen in the

5    community."

6  Then he goes on to say that:

7    "Clearly, the most significant

8    risk factor for this inmate as a

9    precursor to violence would be

10    continued abuse of alcohol. Were

11    he to begin drinking again, his

12    violence potential would be

13    considerably higher than the

14    average citizen in the community."

15  And we are going to order a new psychological

16  evaluation for this inmate's next parole

17  consideration hearing. As far as parole plans

18  go, he does have a number of letters from

19  friends and family. And also a document from

20  family members in Mexico that indicate they

21  will assist him in all his needs, if paroled in

22  that country. We note that the District

23  Attorney from the County of Los Angeles is

24  opposed to parole suitability. And we make the

25  following findings: That the inmate needs to

26  continue on the path that he's on. He needs to

27  JOSE GUZMAN  E-53800  DECISION PAGE 4  9/25/02

43

1    continue participating in any and all self-help

2    and therapy programming that may become

3    available. We appreciate the gains that the

4    inmate has exhibited while incarcerated and

5    hopefully, he'll stay on that path.  He should

6    be commended for his participation in AA and NA

7    programming.  He's done that almost

8    continuously.  And he has had good work

9    reports.  These positive aspects of his

10   behavior do not outweigh the factors of

11   unsuitability.  Again, sir, this is a one year

12   denial.  And we recommend that you remain

13   disciplinary free.  That you just continue

14   doing what you're doing, sir.  We can't ask you

15   to do more.  I think it would be unreasonable

16   to expect you to complete a vocation at this

17   point.  And you may not ever achieve a GED, but

18   we certainly appreciate the effort that you are

19   making in your quest for mastering the English

20   language.  Continue your participation in self-

21   help and therapy programming, whatever becomes

22   available.  Any comments you care to make,

23   Mr. Lehman?

24        DEPUTY COMMISSIONER LEHMAN:   I have no

25   other comments.

26        PRESIDING COMMISSIONER MUNOZ:  Thank you

27   JOSE GUZMAN  E-53800  DECISION PAGE 5  9/25/02

44

1    for being here this morning, sir.  We wish you

2    good luck.  And Ms. Cotton, this is your

3    client's copy.

4         **ATTORNEY COTTON:**  Thank you.

5         **PRESIDING COMMISSIONER MUNOZ:**  Thank you

6    for your presentation.  That concludes the

7    hearing.  It's 22 minutes after 11:00 a.m.

8                   --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED ONE YEAR**

26    **EFFECTIVE DATE OF THIS DECISION** OCT 1 8 2002

27    JOSE GUZMAN   E-53800   DECISION PAGE 6   9/25/02

45

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 44, and which recording was
duly recorded at the CORRECTIONAL TRAINING
FACILITY, at SOLEDAD, CALIFORNIA, in the matter
of the SUBSEQUENT PAROLE CONSIDERATION HEARING
of JOSE GUZMAN, CDC No. E-53800, on SEPTEMBER
25th, 2002, and that the foregoing pages
constitute a true, complete, and accurate
transcription of the aforementioned tape(s) to
the best of my ability.

I hereby certify that I am a
disinterested party in the above-captioned
matter and have no interest in the outcome of
the hearing.

Dated October 12th, 2002, at Sacramento
County, California.

_Karin R. Lewis_
Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT D
(COUNSELOR'S REPORT)

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 2002 CALENDAR


GUZMAN, JOSE                                                    E-53800


I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Murder 2nd, Los Angeles County Case #A980858, Victim: Pasqual Garcia, age unknown. Received into CDC: 4/26/90. Sentence: 15 years to Life with 2 years enhancement.

1.    **Summary of Crime:** On 12/25/88 at approximately 1100 hours, Jose Guzman was living with his son's girlfriend, Marcella Garcia, in his home at the request of his wife who had departed for Mexico on a visit. Guzman had fallen in love with Marcella Garcia. He advised Mrs. Garcia of this on 12/24/88 while they were visiting with her parents. Mrs. Garcia told Guzman that she was going to marry another man. Guzman left the Garcia home and returned approximately 15 minutes later. He parked in front of the Garcia home. Guzman blew the horn on his vehicle until Mrs. Bertha Garcia went back inside the home and her father, Pasqual Garcia, went out to the van to speak with Guzman. As Mr. Garcia approached Guzman's vehicle, he was shot twice by Guzman with a .30 caliber rifle. Guzman exited his vehicle with rifle in hand and Johnny Chacon, took the rifle away from Guzman. Mr. Garcia was taken to a nearby fire station by Johnny Chacon and the victim's son. He was then transported by rescue ambulance to the California Hospital where he was pronounced dead at 11:22 on 12/25/88. When the Los Angeles Police arrived on the scene they asked Guzman if he was the person who shot Mr. Garcia. Guzman raised his left hand and said, "I did it." Mrs. Victoria Ayala asked Guzman why he shot Mr. Garcia. Guzman stated that he wanted them to suffer like he was suffering. (POR, pages 2–4).

2.    **Prisoner's Version:** Guzman did not wish to offer his version. He did state that he had been drinking and could not remember anything else.

B.    **Aggravating/Mitigating Circumstances:**

1.    **Aggravating Factors:**

    a.    The circumstances of the offense indicate premeditation in that the defendant left Mr. Garcia's home in his vehicle, secured a weapon, returned to Mr. Garcia's home and fired the fatal shots.

    b.    Mr. Garcia was particularly vulnerable in that he approached Guzman's vehicle without knowing his intent. Guzman was sitting in his van when he shot Mr. Garcia.

    2.    **Mitigating Factors:** No criminal history noted.

## II.    PRECONVICTION FACTORS:

A.    **Juvenile Record:** None.

B.    **Adult Convictions:** The instant offense is the only police contact Guzman has had with any law enforcement agency.

C.    **Personal Factors:** Guzman was born on 9/28/30 to Mrs. Isabel Michel and Mr. Juan Guzman. Guzman has 13 siblings. He married Mrs. Sophia Hernandez in 1960, which resulted in six children. Guzman was prosecuted and deported to Mexico on 7/30/70. He did not receive any formal education. His education consists of one year at the kindergarten level. Guzman worked as a cook and laborer.

## III.    POSTCONVICTION FACTORS:

A.    **Special Accommodations/Disability:** Guzman is requesting an interpreter for his hearing as well as for his attorney interview. He did not want one at our interview although he was offered the opportunity to have one, and I did not feel that an interpreter was necessary as Guzman was able to understand what I was saying and was able to speak the English language.

B.    **Custody History:** Documents from the previous hearing remain valid and since his last BPT Hearing he has remained housed at CTF in the general population. Guzman has remained assigned in Education and continues to move forward in that area. At his last BPT Hearing on 10/18/01 the Board recommended the following:

    1.    Remain disciplinary free.

    2.    Upgrade vocationally.

3.      Participate in self-help and therapy.

Guzman has done what he can to fulfill these obligations by having no disciplinary history, remaining and progressing in education and continuing his involvement in the 12-Step program and AA and NA. It should be noted that Guzman has raised his GPL to 8.4 which by CDC standards would make him eligible to be removed from Education. Guzman remains in Education by his own choice in order to reach the goal of obtaining his GED.

C.      **Work, Education, Vocation, Therapy & Self-Help Activities:** Guzman is a participating member of the 12-Step Program as well as AA and NA. He also contributed to the Children's Holiday Festival. Refer to Postconviction Progress Report for details.

D.      **Disciplinary History:** Guzman has been disciplinary free his entire period of incarceration.

## IV.    FUTURE PLANS:

A.      **Residence:** Guzman plans to reside with his mother, Mrs. Isabel Michel at Mutualesmo #4, Authlan Jalisco, Mexico. There is no current telephone number available.

B.      **Employment:** Guzman plans to work on the family ranch in Mexico.

## V.    USINS STATUS: Active USINS hold, #A70145432.

## VI.    SUMMARY:

A.      Considering the commitment offense and in-custody adjustment, I believe Guzman would pose a moderate degree of threat to society if released. Guzman has adjusted well to being in custody and has made steady progress in the area of education. This is extremely important and Guzman realizes this, which is apparent by his recent score on the TABE test where he raised his GPL to 8.4 and is currently enrolled to the Academic Literacy Lab. Mr. Guzman should be commended for his efforts. His continued participation in AA and NA, as well as the 12-Step program, I feel, are the keys to a successful parole for Guzman as alcohol seemed to play a large role in his commitment offense. Guzman realizes this which is why he continues to attend these programs. In speaking with Guzman's housing unit staff they stated that Guzman is never a problem in the housing unit and is always very respectful.

B.    Prior to his release he would benefit from continuing to progress in his education, remaining disciplinary free, and continuing his participation in AA and NA.

C.    This Board Report is based on a thorough review of the Central File, an interview with Guzman, and information from his housing unit officers. Guzman was afforded the opportunity to review his Central File per the Olson Decision which he declined on 6/7/02.

D.    No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 2002 CALENDAR


_____

D. Carnazzo
Correctional Counselor I


_____

L. Gibbs
Correctional Counselor II (A)


_____

I. Guerra
Facility Captain


_____

D.S. Levorse
Classification and Parole Representative


GUZMAN, JOSE              E-53800              CTF-Soledad              OCT/2002

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
       ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 8/01 to 4/02 | | | **PLACEMENT:** Remained at CTF. **CUSTODY:** MED A **CLASSIFICATION SCORE:** 0 **ACADEMIC:** Assigned to ABE-III until 3/21/02 when he was switched to ABE-III/Academic Literacy Lab. Education Progress Reports dated 9/28/01, 12/31/01 and 3/21/02 reflect satisfactory grades. He has achieved a GPL of 8.4. **WORK:** None during this period. **VOCATION:** None during this period. **GROUP ACTIVITIES:** Member of the 12-Step program. Laudatory chronos dated 11/15/01, 2/15/02, and 4/10/02. Participated in AA and NA. Laudatory chronos dated 1/1/02 and 3/10/02. Contributed money to the Children's Holiday Festival. **PSYCH TREATMENT:** None this period. **PRISON BEHAVIOR:** Remained disciplinary free. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE
8-27-02

GUZMAN, JOSE        E-53800        CTF-SOLEDAD        OCT/2002

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                                                      STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/02 to 6/02 | | | **PLACEMENT**:  Remained at CTF.<br>**CUSTODY**:  MED A<br>**CLASSIFICATION SCORE**: 0<br>**ACADEMIC**: Remained assigned to ABE-III Academic Literacy Lab.<br>**WORK**:  None this period.<br>**VOCATION**:  None this period.<br>**GROUP ACTIVITIES**:  Participated in the 12-Step Program, AA, and NA.<br>**PSYCH TREATMENT**:  None this period.<br>**PRISON BEHAVIOR**:  Remained disciplinary free. |

ORDER:

☐   BPT date advanced by     months.     ☐   BPT date affirmed without change.
☐   PBR date advanced by     months.     ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐   Previously imposed  conditions affirmed.
☐   Add or modify

☐   Schedule for Progress Hearing on appropriate institutional calendar

GUZMAN, JOSE      E-53800      CTF-SOLEDAD      OCT/2002

BOARD OF PRISON TERMS                                                                                      STATE OF CALIFORNIA

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2001 CALENDAR


**GUZMAN, JOSE**                                                                 **E-53800**


I.    **COMMITMENT FACTORS:**

    A.    **LIFE CRIME:**  All relevant documents from the previous hearing(s) including the transcripts have been considered and the information appears valid.  This writer has no further information to add.

    B.    **PRISONER'S VERSION:**  Inmate was allowed to read previous report and agrees.

    C.    **AGGRAVATING CIRCUMSTANCES:**

        1.    During the commission of the crime, the inmate had a clear opportunity to cease but instead continued.

        2.    The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime.

    D.    **MITIGATING CIRCUMSTANCES:**  None.


II.   **PRECONVICTION FACTORS:**  Documents from the previous hearing(s) have been considered and that information remains valid.


III.  **POSTCONVICTION FACTORS:**  Documents from the previous hearing(s) have been considered and that information remains valid.  During the period of time since the last hearing, he has remained disciplinary free since reception.

Guzman is presently assigned to academics with satisfactory plus ratings.  Guzman has persevered in his academic assignment to attain satisfactory ratings, his TABE score is 8.0 per CDC 128B dated 11/03/00.  For this period of review Guzman has participated in AA and 12 step program as reflected on the Postconviction Progress Report.


IV.   **FUTURE PLANS:**

A.     **Residence:**  Inmate Gomez plans to reside with his mother Isabel Mitchel at Mutualesmo #4, Autlan, Jalisco, Mexico; telephone # 011523381061.  Guzman plans to work on the family ranch in Mexico.


V.     **SUMMARY:**

A.     Considering the commitment offense, prior record and in custody adjustment, I believe that inmate Guzman would pose a moderate degree of threat to society if he is released from custody at this time, due to his inability to remember the circumstances of the case.  Further, his ability to stay sober will play an important factor in his re-entry into society.

B.     Prior to his release he would benefit from continuing to upgrade his education, participate in self-help and therapy, no vocation recommended due to his age.

C.     The Board Report is based upon a thorough review of the Central File and an interview with Guzman.  Guzman declined Olson Review, per CDC 128B dated 2-06-01.

_____
E. Donnelly
Correctional Counselor I

_____
C. Plymesser
Correctional Counselor II

_____
A. Tomasetti
Facility Captain

_____
D.S. Levorse
Classification and Parole Representative

BOARD OF PRISON TERMS

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/27/00 to 02/05/01 | | | **PLACEMENT**: CTF. <br> **CUSTODY**:  Med A. <br> **CLASSIFICATION SCORE**:  0. <br> **ACADEMIC**:  He was assigned to the Academic program during this period of review, with satisfactory ratings. <br> **WORK**:  None this period. <br> **VOCATION**:  None this period. <br> **GROUP ACTIVITIES**:   Active member of AA, 128B 08/20/00, 11/12/00. <br> **PSYCH TREATMENT**:   None this period. <br> **PRISON BEHAVIOR**:   Remained disciplinary free. |

GUZMAN, JOSE                E-53800                CTF-SOLEDAD                MAY/2001

DATE  8-20-01

BPT 1004 (REV 7/86)

Page _1_

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    **ADDENDUM**
MAY/2001


S. Martinez
Correctional Counselor I


R. Leach
Correctional Counselor II


I. Guerra
Facility Captain


D.S. Levorse
Classification and Parole Representative


GUZMAN, JOSE          E53800                    CTF                    MAY/2001
BPT 1004 (REV 7/86)                    2

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 04/28/99 to 04/27/00 | | | **PLACEMENT:** CTF.<br>**CUSTODY:** Med A.<br>**CLASSIFICATION SCORE:** 0.<br>**ACADEMIC:** He was assigned to the Academic Program during this period of review, with satisfactory ratings.<br>**WORK:** None this period.<br>**VOCATION:** None this period.<br>**GROUP ACTIVITIES:** Current member of Twelve Step program, 128B 09/08/99.<br>**PSYCH TREATMENT:** None this period.<br>**PRISON BEHAVIOR:** Remained disciplinary free.<br>**OTHER:** Received a laudatory chrono for his positive attitude towards academic improvement, 128B 05/05/99. |

ORDER:
☐  BPT date advanced by          months.          ☐  BPT date affirmed without change.
☐  PBR date advanced by          months.          ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐  Previously imposed conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

GUZMAN, JOSE          E-53800               CTF-SOLEDAD          MAY/2001

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                              Page _3_

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
MARCH 1999 CALENDAR

**GUZMAN, JOSE**

E-53800

I.    **COMMITMENT FACTORS:**

A.    **Life Crime**:   Murder 2nd, Los Angeles County, Case# A980858, Victim: Pasqual Garcia, Age Unknown.  Received CDC 4/26/90, Sentence: 15 years to Life with 2 years enhancement.

1.    **Offense Summary**:   On 12/25/88 at approximately 1100 hours, Jose Guzman hereafter refered to as Inmate Guzman was living with his son's girlfriend, Marcella Garcia, in his home at the request of his wife who had departed for Mexico on a visit.  Inmate Guzman had fallen in love with Marcella Garcia.  He advised Mrs. Garcia of this on 12/24/88 while they were visiting with her parents.  Mrs. Garcia told Inmate Guzman that she was going to marry another man.  Inmate Guzman left the Garcia home and returned approximately fifteen minutes later.  He parked in front of the Garcia home.  Inmate Guzman blew the horn on his vehicle until Mrs. Bertha Garcia (Marcella's sister) went out to see what he wanted.  Inmate Guzman gave her a message for Marcella "this was the last chance for Marcella to go with him".  Mrs. Bertha Garcia went back inside the home and her father, Pasquel Garcia, went out to the van to speak with Inmate Guzman.  As Mr. Garcia approached Inmate Guzman's vehicle he was shot twice by Inmate Guzman with a .30 caliber rifle.  Inmate Guzman exited his vehicle with rifle in hand, and Johnny Chacon, took the rifle away from Inmate Guzman.  Mr. Garcia was taken to a nearby fire station by Johnny Chacon and the victim's son, where he was transported by rescue ambulance to the California Hospital where he was pronounced dead at 11:22 on 12/25/88.  When the Los Angeles Police arrived on the scene they asked Inmate Guzman if he was the person who shot Mr. Garcia.  Inmate Guzman raised his left hand and said I did it.  Mrs. Victoria Ayala, stated that her father asked Inmate Guzman why did he shoot him, and he stated that he wanted to make them suffer like he was suffering. (Probation Officers Report pgs 2-4)

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
MARCH 1999 CALENDAR                                                         PAGE 2

    2.    **Prisoner's Version**:  Inmate Guzman did not wish to offer his version. He did state that he had been drinking and could not remember anything else.

    3.    **Aggravating Circumstances**:

        a.    The circumstances of the offense indicate premeditation in that the defendant left Mr. Garcia's home in his vehicle, secured a weapon, returned to Mr. Garcia's home and fired the fatal shots.

        b.    Mr Garcia was particularly vulnerable in that he approached Inmate Guzman's vehicle without knowing his intent.  Inmate Guzman was sitting in his van when he shot Mr. Garcia.

    4.    **Mitigating Circumstances**:  None

## II.    PRECONVICTION FACTORS:

A.    **Juvenile Record**:  None

B.    **Adult Convictions**:  The instant offense is the only police contact Inmate Guzman has had with any law enforcement agency.

C.    **Personal Factors**:  Inmate Guzman was born on 9/28/30 to Mrs. Isabel Michel and Mr. Juan Guzman.  Inmate Guzman has 13 siblings.  He married Mrs. Sophia Hernandez in 1960, which resulted in six children.  Inmate Guzman was prosecuted and deported to Mexico on 7/30/70.  He did not attained any formal education.  His education consists of one year at the kindergarten level.  Inmate Guzman worked as a cook and laborer.

## III.    POSTCONVICTION FACTORS:

A.    **Custody History**:  Inmate Guzman was received in CDC on 4/26/90 at the California Correctional Institution.  He was transferred to CMC-E on 10/2/92, CSP-Corcoran on 1/21/93, PVSP on 11/3/94 and CTF on 1/22/95.  His assignment history indicated that he has been assigned to the academic department during this period. Guzman is currently a participating member of the Twelve Step Program.  He has not received any CDC 115's or 128's..

B.    **Therapy and Self-Help Activities**:  Inmate Guzman is a participating member of the Twelve Step program.

    C.    **Disciplinary History**: Inmate Guzman has been disciplinary free his entire period of incarceration.


## IV.    FUTURE PLANS:

    A.    **Residence**: Inmate Guzman plans to reside with his mother Mrs. Isabel Michel at Mutualesmo #4, Authlan Jalisco Mexico, there is no current telephone number available.

    B.    **Employment**: Inmate Guzman plans to work on the family ranch in Mexico.


## V.    SUMMARY:

    A.    Considering the commitment offense, prior arrest record and in custody adjustment, I believe that Inmate Guzman would pose a high degree of threat to society if he is released from custody at this time, due to his inability to remember the circumstances of the case. Further, his ability to stay sober will play an important factor in his reentry into society.

    B.    Prior to his release he would benefit from continuing to upgrade his education, participating in self help and therapy. Due to his age I am not recommending any vocational training.

    C.    The Board Report is based upon a thorough review of the Central File, an interview with Inmate Guzman and incidental contact in the housing unit. Inmate Guzman reviewed his Central File on 11/24/98.

LIFE PRISONER EVALU,    )N REPORT
PAROLE CONSIDERATION HEARING
MARCH 1999 CALENDAR                                               PAGE 4


W. Brown
Correctional Counselor I




J.A. Selvidge
Correctional Counselor II




J. Gomez
Facility Captain




J.K. Tyler
Classification & Parole Representative

Guzman, Jose              E-53800              CTF              3/99

BOARD OF PRISON TERMS                                                                            STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- ☐ DOCUMENTATION HEARING
- ☒ PAROLE CONSIDERATION HEARING
- ☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
    ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 7/96 To 7/97 | | | **PLACEMENT:** Inmate Guzman remained at CTF and housed in the general population during this period. **CUSTODY:** His custody remained at Medium A during this period of review. **CLASSIFICATION SCORE:** His classification score was reduced to 18 points during this period of review. **ACADEMIC:** He was assigned to the academic program during this period of review. **WORK:** None noted during this period of review. **VOCATION:** None noted during this period. **GROUP ACTIVITIES:** Inmate Guzman has been an active member of the Alcoholic Anonymous Program since 11/95. **PSYCH TREATMENT:** None noted during this period of review. **PRISON BEHAVIOR:** Inmate Guzman remained disciplinary free during this period of review. |

CORRECTIONAL COUNSELOR'S SIGNATURE               DATE  *1-11-99*

Guzman Jose          E-53800          CTF          3/99

# EXHIBIT E
(CERTIFICATE OF ACHIEVEMENTS)



Valley Adult School

Certificate Of Achievement

Plato Language Arts Curriculum

in

To

Jose Guzman

CERTIFICATE NUMBER: 12,292

INSTRUCTOR:
Joseph W. Kingston
6/28/02

Supervisor of Academic Instruction
Mr. M. Abdul-Mateen

Supervisor of Education
Mr. G. Atchley

E-53800



# Valley Adult School

## Certificate Of Achievement

IN

### Plato Reading Curriculum

TO

## Jose Guzman

CERTIFICATE NUMBER: 12, 293

INSTRUCTOR:

Joseph W. Kingston

6/28/02

Supervisor of Academic Instruction
Mr. M. Abdul-Mateen

Supervisor of Education
Mr. G. Atchley

CERT. #
12, 293

E-53800

Q-File

STATE OF CALIFORNIA

DEPARTMENT OF CORREC
CDC-128 I

**NAME and NUMBER**     **GUZMAN**          **E53800**          **DW-301AU**

Inmate **GUZMAN, E53800, DW-301AU,** has been actively attending the Alcoholics Anonymous / Narco
Anonymous (Group "A") at CTF-Central Facility. The meetings are held in the Dining Hall #2 on Saturd
between 1030 and 1230 hours. Mr. **GUZMAN** has been an contributing member of this group si
November, 1995. Mr. **GUZMAN** has positively participated and shown his ability to understand a
comprehend all aspects of the Twelve Steps Programs, through his own self-improvement techniques.
**GUZMAN** is to be lauded for his continued participation and positive contributions to Alcoholics Anonym
/ Narcotics Anonymous here at CTF-Central Facility.

ORIG  :  CENTRAL FILE
cc    :  INMATE GUZMAN,
      :  SPONSOR

**DAVE RODRIGUEZ**
Alcoholics Anonymous / Narcotics Anonymous Spon
CTF-Central Facility

**DATE**  03/10/02          *LAUDATORY A.A / N.A. PARTICIPATION CHRONO*          **INFORMATIVE CHR**

---

**NAME: GUZMAN, J.**                    **E53800**          **DW-301AU**          CDC-

Mr. **GUZMAN** is a current member of a **TWELVE STEP PROGRAM** modeled on the principles
**ALCOHOLICS ANONYMOUS**, and **NARCOTICS ANONYMOUS**, at the CTF Central Facility. GUZMA
has been a member of this program since 8/2001 at CTF-Soledad, and has shown the ability to relate with t
group(s) and to improve himself through involvement with said groups(s). Having met the minimu
requirement for the 1st quarter term period of 2002, his participation in said group(s) has demonstrated
willingness to cooperate in the smooth atmosphere of the A.A./N.A. environment.

CC: **C-File**
    A.A. File
    Inmate

David Rodriguez
CTF-Central

**DATE: April 10, 2002**          **(Laudatory/Participation - "B" Group)**          **GENERAL CHR**

STATE OF CALIFORNIA

DEPARTMENT OF CORRECT
CDC-128 B

**NAME and NUMBER**     **GUZMAN**              **E53800**         **DW-301AU**

Inmate **GUZMAN, E53800, DW-301AU**, has been actively attending the Alcoholics Anonymous / Narcot
Anonymous (Group "A") at CTF-Central Facility.  The meetings are held in the Dining Hall #2 on Saturda
between 1030 and 1230 hours.  Mr. **GUZMAN** has been an contributing member of this group sin
November, 1995.  Mr. **GUZMAN** has positively participated and shown his ability to understand a
comprehend all aspects of the Twelve Steps Programs, through his own self-improvement techniques.  M
**GUZMAN** is to be lauded for his continued participation and positive contributions to Alcoholics Anonymo
/ Narcotics Anonymous here at CTF-Central Facility.

ORIG  :   CENTRAL FILE
cc    :   INMATE GUZMAN,
      :   SPONSOR

**DAVE RODRIGUEZ**
Alcoholics Anonymous / Narcotics Anonymous Spons
CTF-Central Facility

**DATE**   01/01/02        *LAUDATORY A.A / N.A. PARTICIPATION CHRONO*          **INFORMATIVE CHRO**

---

NAME: GUZMAN, J.                        E53800        DW-301AU        CDC-1

Mr. **GUZMAN** is a current member of a **TWELVE STEP PROGRAM** modeled on the principles o
**ALCOHOLICS ANONYMOUS**, and **NARCOTICS ANONYMOUS**, at the CTF Central Facility. GUZMAN
has been a member of this program since 8/2001 at CTF-Soledad, and has shown the ability to relate with th
group(s) and to improve himself through involvement with said groups(s).  Having met the minimun
requirement for the 4th quarter term period of 2001, his participation in said group(s) has demonstrated a
willingness to cooperate in the smooth atmosphere of the A.A./N.A. environment.

CC: **C-File**
    A.A. File
    Inmate

David Rodriguez
CTF-Central

**DATE: February 15, 2002**      **(Laudatory/Participation - "B" Group)**        **GENERAL CHRON**

NAME: GUZMAN, J.                E53800         DW-301AU      CDC-1

Mr. GUZMAN is a current member of a **TWELVE STEP PROGRAM** modeled on the principles o **ALCOHOLICS ANONYMOUS**, and **NARCOTICS ANONYMOUS**, at the CTF Central Facility. GUZMAI has been a member of this program since 8/2001 at CTF-Soledad, and has shown the ability to relate with th group(s) and to improve himself through involvement with said groups(s). Having met the minimur requirement for the 3rd quarter term period of 2001, his participation in said group(s) has demonstrated willingness to cooperate in the smooth atmosphere of the A.A./N.A. environment.

CC: **C-File**
    A.A. File
    Inmate

                                    David Rodriguez
                                    CTF-Central

DATE: **November 15, 2001**       **(Laudatory/Participation - "B" Group)**       **GENERAL CHRO:**

**NAME**    GUZMAN, J      **NUMBER**    E53800    **CELL**    DW-301AU    **CDC-128B**

Inmate GUZMAN E53800 is to be commended for his generous contribution to the Annual Children's Holiday Festival and for meeting the challenge of continued progress for inmates and their children. The Children's Holiday Festival is an annual event that symbolizes family and unity. The sponsors wish to thank Inmate GUZMAN for giving to children who are in need of our support. Inmate GUZMAN's contribution made it possible to provide food, entertainment and gifts to each and every child in attendance. Additionally, Inmate GUZMAN's contribution helped to support the MAC's first Annual Children's Holiday Festival, a tradition that will live on for many years to come.

Original:    C-File
    cc:      Writer                          **B. Crawford, CCII**
           Inmate                          **Festival Co-Sponsor**

DATE: **November 30, 2001**       Laudatory Chrono       **GENERAL CHRONO**